

# In the Missouri Court of Appeals

## Eastern District

### DIVISION ONE

| | | |
|---|---|---|
| IN THE INTEREST OF: | ) | No. ED103681 |
| | ) | |
| K.M.A.-B. | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| | ) | |
| | ) | Hon. Thea Anne Sherry |
| | ) | |
| | ) | Filed: July 12, 2016 |

J.B. ("Father") appeals from the judgment terminating his parental rights. The judgment is reversed and remanded.

The evidence in this case is almost entirely undisputed, and many of the facts were stipulated before trial. Thus, only to the extent there was conflicting or contradictory evidence would we need to view the facts in the light most favorable to the trial court's judgment. See In re J.M.T., 386 S.W.3d 152, 158 (Mo. App. S.D. 2012).

K.M.A.-B. was born on May 11, 2012. He had been exposed to methadone in utero and remained hospitalized for weeks after his birth. His mother admitted using heroin before and after the child's birth, and she could not care for him. The child was taken into custody by the Children's Division on July 2nd on allegations of abuse and neglect by his mother. Ultimately, the mother was incarcerated and her parental rights were terminated in the same judgment as Father's, but are not at issue on appeal.

At first, the child's biological father was unknown to the Division. Father was identified a few days later as 27-year old J.B. Father had never been married and had no other children.[1] He was no longer in a relationship with the child's mother; he said he broke off that relationship when he learned she had problems with prescription drugs and heroin. Father was employed full-time as a roofer and carpenter and remained gainfully employed throughout the proceedings.[2] Father owned his own three-bedroom home in St. Charles County and maintained stable housing, which the Division found suitable with no concerns, throughout the proceedings. Father is a high school graduate, and has been on his own since he was seventeen.

Father indicated at the protective custody hearing on July 6th that he wanted custody of the child. The trial court[3] granted Father supervised visitation, and he met with the child four times over the next month. Every visit was reported to be appropriate—Father held and fed the newborn, brought him clothes, toys and supplies and asked about his health and what else he needed. Other than the first visit, which was at the mother's home, all of Father's visits over the course of this case were conducted at the Division's social service agency. Father failed to show up for one visit and had to cancel five others over the next two and half years.

Father was ordered to submit to drug screens at the Division's request. Father refused the first time the Division requested a urine test on August 15, 2012. He admitted to the case manager that the test would be positive because he used marijuana to relieve his insomnia and restless leg

---

[1] Father said he was a "father figure" to the mother's three other children, one of whom continued to spend weekends with Father. At the time of termination, Father's girlfriend and her nine-year old son were living with him, about which the Division had no concerns.

[2] Father never verified this employment with the Division, but there was no evidence to contradict his reported employment.

[3] The Family Court Commissioner issued findings and recommendations in this case, which were each adopted by and confirmed as the judgment of the trial court. For ease of reference, the opinion refers simply to the trial court throughout.

syndrome, but he was uncomfortable urinating in front of other people. He told the case manager he would submit to hair follicle testing in the future.

After a dispositional hearing on August 29, 2012, the court took jurisdiction of the child based on findings of abuse and neglect, citing Father's drug use. The permanency plan at that time was to reunify the child with a biological parent or, alternatively, place the child for adoption. Meanwhile, the child would remain in foster care. Father was granted supervised visitation with the child and was ordered to participate in parenting assessments, substance abuse evaluations and drug screens. Father was also ordered to contribute to the child's support.

On August 30, 2012, Father tested positive for THC based on what appears to have been a urinalysis. There is a notation of "+134" on the results. He did not show up for the next requested drug screen in October. Thereafter, a service plan was developed for Father, which established the following goals and accompanying tasks: continue contact with the child and improve that relationship by visiting with the child at least twice a month for one supervised hour; provide financial support by maintaining stable employment or other income; cooperate with the Division by keeping it apprised of his contact information, utilizing the services offered, participating in services recommended as a result of evaluations ordered under the plan and complying with Court orders; maintain suitable housing; and "become and remain drug free" by undergoing an evaluation and completing drug screens. Father refused to discuss and sign his agreement to this plan and instead requested a hearing.

Father thereafter wrote a letter to the trial court, explaining his belief that a drug testing company's opinion about drugs in his system is a violation of his constitutional rights, but also indicated that no drug should be used in front of a child. Father was "unable to provide" a sample at the next requested drug screen. The case manager reminded Father of the importance of

3

following court orders, including drug screens. Father told the case manager that he could not be forced to do something against his religious beliefs, stating he had decided to convert to Rastafarianism.

Meanwhile, Father had six more visits with the child between the beginning of September and the end of November 2012. Again, those visits were deemed appropriate by the Division's case managers: Father was attentive to the infant, held him, talked to him, consoled him calmly when he cried and played with him. Father brought toys, clothes and supplies, inquired about the child's health and asked what else the child needed.

After a review hearing in November of 2012, the court continued its jurisdiction over the child. It found that Father had "not sufficiently engaged in services," though it is unclear to what services that referred. Again Father was granted supervised visitation and ordered to submit to a parenting assessment, substance abuse evaluation and drug screens. Father visited with the child nine times between November of 2012 and January of 2013 and was reported to be genuine, loving, positive and encouraging toward the child. He continued to inquire about the child's health and his needs and continued to consistently bring the child appropriate supplies, toys and clothes.

Father completed a parenting assessment with a psychologist in December of 2012. Father told the psychologist he smoked marijuana "rarely," only a couple of times a month, and denied being an addict. He told her that he converted to Rastafarianism after he came under scrutiny by the Division and that sacramental marijuana smoking is part of that religion, which is therefore protected under the Constitution. He stated that his marijuana use does not negatively impact his life and that his work and financial success reflected this.

The psychologist concluded that Father had no cognitive impairment or significant psychiatric problems. He had "unusual beliefs" and was immature and stubborn, as evidenced by

4

his assertions regarding conversion to Rastafarianism. But he had also been independent and self-sufficient since he was a teen, successfully meeting all of his financial obligations without support. Father was not apt to admit faults and appeared to underreport any difficulties he had, including the frequency of his marijuana use. One screening test the psychologist used indicated a low probability of a substance disorder. Under the DSM-IV in effect at the time, Father met the criteria for a "cannabis abuse" diagnosis. The doctor concluded that Father appeared "genuinely committed" to parenting his son and that his "parenting beliefs and expectations with regards to his child appeared to be generally appropriate and practical." She recommended he get hands-on parenting assistance if the infant was returned to Father's full custody. She also recommended continued drug screens: "Serial positive screens, particularly those that reflect high levels of THC, would indicate the need for a referral to drug treatment."

On January 14, 2013, he tested positive for THC based on a hair follicle test with the notation "6.18 pg/mg." After a hearing later that January, the court again continued its jurisdiction over the child, finding that Father acknowledged continued use of marijuana. Again Father was granted supervised visitation and ordered to undergo a substance abuse evaluation and drug screens. In February, Father indicated to the case manager that he would appease the court and stop using cannabinoids. He then asked what would happen if he stopped using, got custody of the child and then moved somewhere marijuana use was legal. The case manager told him it would not be in the child's or his best interest to begin using again. On March 7th, Father tested positive for THC in his hair follicle at "4.86 pg/mg," which was lower than the levels on the January results. After another hearing in late March 2013, the court continued jurisdiction, noting that Father's drug screens continued to be positive but "demonstrate declining levels." It granted supervised visits, but stated that "if Father's next drug screen continues to reflect decreasing levels of

marijuana, he may be granted periods of unsupervised visitation not to exceed six hours." The court ordered continued drug screens.

It was stipulated that in April of 2013, Father underwent a substance abuse evaluation and that "no services were recommended from the substance abuse evaluation as father reported he did not have a substance abuse problem." The evaluation itself is not in the record, and there are no further details about the evaluation or its recommendations in the record.

Father continued to visit with the child several times a month through April, May and June of 2013, all of which were seen as appropriate and included Father encouraging the child as he tried to take his first steps. Father did not appear for his requested drug screen in May. After a hearing, the court continued its jurisdiction in July, noting that Father had "failed to participate in drug screens so as to provide the court the opportunity to assess the extent of his drug use." The court still indicated that reunification with Father was the permanency plan, gave him supervised visits and ordered continued drug screens. Father continued to consistently visit with the child weekly through September, and the case managers continued to report that the visits were appropriate. During that time frame—July through September—Father tested positive for THC three times. Though the actual results and levels of these tests are not in the record, the court noted that Father had "provided falling levels." The court continued jurisdiction again in early October and ordered that "upon production of clean screen, Father will move to periods of unsupervised [visits]."

Thereafter, Father tested positive for THC on October 22, 2013, and then refused to appear for the next drug screen in December. In January 2014, the court held a hearing and then changed the permanency plan to adoption only, not reunification with Father. It noted that "Father has again refused to participate in drug screens." He was granted supervised visits and was ordered to

6

continue with drug screens. He tested positive for THC in February. Meanwhile, Father had been consistently visiting with the child from October of 2013 to March of 2014, and all reports were that the visits continued to be appropriate.

In April of 2014, the juvenile officer filed a petition to terminate Father's parental rights. It alleged (1) abuse or neglect and (2) failure to rectify in that the child had been under court jurisdiction for at least a year and the conditions that led to the assumption of jurisdiction persisted or there existed conditions of a potentially harmful nature such that it was unlikely to be remedied at an early date so the child could reunite with Father or continuation of the parent-child relationship greatly diminished the child's prospects for early integration into a permanent and stable home. Shortly after the petition was filed, Father again tested positive for THC on April 28, 2014. There is no record of any further drug screens. After a hearing in May of 2014, the court ordered that the Division was no longer required to make reasonable efforts to reunify the child with Father because the petition to terminate had been filed. Moreover, Father continued to acknowledge regular marijuana use. Similar orders were entered after hearings in October of 2014 and March of 2015, in which the court found that Father acknowledged continued use of marijuana.

During the year between the filing of the petition and the trial in April and May of 2015, Father consistently visited with the child under supervision. The child was then a toddler, two to three years old. According to the case manager's report, Father continued to play and interact appropriately with the child and bring appropriate clothes, toys and supplies for him.

Father was present at the trial on the termination petition, but did not testify. He put on one witness, the psychologist who performed the parenting assessment. She testified that since her diagnosis of "cannabis abuse" at the end of 2012, an updated DSM-V was issued. Thereunder, she perhaps would not have diagnosed Father with what is now called "cannabis use disorder."

7

Based on what she knew about Father from her visits with him in 2012, he met only one factor in the DSM, namely, the interpersonal problems he was having gaining custody of his child due to his cannabis use. Though this one factor was sufficient for the "cannabis abuse" diagnosis under the old DSM-IV, the current DSM-V required the presence of two factors to diagnose a person with "cannabis use disorder." The doctor testified that she had not recommended drug treatment in 2012 because Father reported fairly minimal use and since he did not see it as a problem in his life, he likely would not have benefitted from treatment.

The Division presented the testimony of three of the case managers who had been assigned to this case over the years. One said Father had told her that he used marijuana for medicinal purposes and did not believe that he had a problem. He never told her that he used it just for recreational reasons. She said that in the beginning, the drug screen result contained the levels of THC and then, at some point, they changed to just reporting a positive or negative result based on a cutoff amount of THC. The case manager understood that urine tests can detect drugs in system from the previous 45 days and hair follicle tests can detect drugs in the system from the previous three months. She had no reason to believe from what she observed during the 27 visits she supervised between Father and the child that Father would not be a good parent. He was always appropriate, and she had no concern he would harm the child.

When asked if the case manager thought Father's use of marijuana would prevent him from being a good parent, she said she had concerns because it is an illegal substance, which posed a risk of searches by police and other risks associated with buying drugs from criminals. She also testified that it could be harmful if he drove with the child while under the influence of marijuana. But she admitted that she could not really say whether this potential harm was to such a degree

that Father could not parent because he was not actually parenting the child at the time, having been limited in his relationship to supervised visits at a social work agency.

Another case manager testified that Father was forthcoming about his drug use, though did not tell her amounts. He told her he used cannabinoids to alleviate lower back pain and decrease stress. He said he used the drug in a concentrated oil form and would never use it in front of the child. The case manager described Father as very health conscious himself and also concerned about what the child was eating. She discussed with Father the huge barrier to reunification that his drug use posed, which he said he understood and then gave her a detailed rationalization of his use. This case manager also testified that Father was appropriate during all of the visits she supervised. She never personally observed Father under the influence of drugs or otherwise impaired. When asked what specifically concerned her about Father's cannabinoid use and parenting the child, she responded "[p]rioritizing his child's needs and decision making." Rather than actively addressing this known barrier to reunification with the child, she explained, Father chose to minimize and rationalize it. In this way, she believed, he did not put his child's needs first. But she admitted that the problem was the fact that he refused to stop using marijuana and the thought-process behind that decision, *not* that the use of this drug itself actually impaired his ability to parent.

A third case manager—the most recent one assigned to this case—testified similarly about very positive interactions between Father and the child at all the visits she supervised. They appeared bonded and enjoyed their time together. The Guardian ad Litem was present for several of the visits she supervised, and Father spent some of those visits talking just to the GAL instead of playing with child. The case manager noted no problem with adults socializing while with their children, but was concerned with lack of supervision. She cited only one example of such lack of

9

supervision, in which she went to pull the child off a bookshelf he had started to climb. She could provide no other details, including if or how Father reacted. The case manager could not say the child would be safe in an unsupervised visit with Father because of the possible legal ramifications of his possession of marijuana. She did not discuss with Father his explanation for using marijuana, saying that was not important because regardless of the reasons, it is illegal in Missouri. He did, however, give her receipts from a Denver facility for various forms of marijuana to show that he purchased it legally. He never appeared under the influence of marijuana to her. She did not believe Father would take advantage of any further referrals from her agency. He gave her no indication that he intended to stop using marijuana.

The GAL testified that after his two years working on this case and based on his "firsthand observations" of visits between Father and the child and of Father's home and based on the "extensive amount" of legal research and factual research, he recommended not terminating Father's rights.[4] He recognized the significance of his recommending reunification with a parent that has THC—of unknown amounts—in his system and therefore went to "extra lengths, great lengths to educate [himself] on this issue." He said he observed what he called "the strongest bond" he had ever seen between a parent and child in 17 years of GAL work. In getting to know Father and visiting his home, he concluded that there was not going to be any harm in placing this child with Father. The GAL testified that in all his discussions with Father about his marijuana use, he never said he used it just to get high or have fun, rather there was always some medicinal

---

[4] As the child's legal representative in these proceedings, the GAL was to be guided by the best interests of the child in all matters and exercise independent judgment in formulating and presenting recommendations to the court. Standard 3.0, Standards with Comments for Guardians ad Litem in Juvenile and Family Court Division Matters. Appendix C foll. Missouri Supreme Court Rule 129. Thus, the GAL was required to maintain "objectivity that preserves a clear focus on the child's best interests." Standard 3.0, comment. The GAL's recommendations must be based on the evidence and consistent with the best interests of the child. Standard 13.0. To make the recommendation, the GAL "should have knowledge of the child's circumstances from all sources." Standard 13.0, comment. "While trial courts do not have to defer to a GAL's recommendation, the conclusions and recommendations of the GAL are entitled to respectful consideration." In re K.L.C., 332 S.W.3d 330, 343 (Mo. App. S.D. 2011).

reason. Although it is illegal, the GAL could not find any harm to the child in the way Father used it. The GAL described Father as "very stubborn" but understood Father's position that marijuana was less harmful than some other legal, but heavier, narcotics he could take for pain. Father told the GAL he felt he should not have to switch to those treatments for pain simply because they were legal. Even though Father was being "pigheaded" about the issue, the GAL did not see any direct or potential harm to the child. The GAL equated this situation to a 20-year old drinking a couple of beers after work, which would be illegal, but not harmful. The GAL never observed Father under the influence at a visit with the child and believed Father when he said he would never use marijuana in front of the child.

The child had been placed with Father's great uncle and his wife in October of 2012, and they have had physical custody throughout the proceedings. The foster mother testified that the child called her "Mom," her husband "Daddy John" and Father "Daddy Jason." Father consistently provided them $200-$300 in monthly support for the child as well grocery gift cards and the items he brought to visits. The foster parents are interested in adopting the child.

The trial court entered judgment terminating Father's parental rights on grounds of abuse or neglect under Section 211.447.5(2) and a failure to rectify under Section 211.447.5(3). The statutory condition on which the trial court expressly relied to support both of those grounds was Father's marijuana use, finding it was a chemical dependency under Section 211.447.5(2)(b) and 211.447.5(3)(d). The court also found that termination was in the child's best interest based on its findings under Section 211.447.7. This appeal follows. Further details of the court's findings and conclusion are discussed in the analysis below.

**Standards for Termination and Review**

11

The statutes governing the termination of parental rights "shall be construed so as to promote the best interests and welfare of the child" considering (1) the constitutional rights of all parties in the proceedings (2) protection of the birth family relationship when possible and appropriate and (3) the entitlement of every child to a permanent and stable home. Section 211.443. There are serious constitutional implications of terminating a parent's rights. In re K.A.W., 133 S.W.3d 1, 12 (Mo. banc 2004). A parent has a fundamental liberty interest in raising his or her child, which is protected by the due process clause. Id. Termination of that interest is a "drastic intrusion into the sacred parent-child relationship" tantamount to a "civil death penalty." Id. It is not an interest that evaporates simply because one has not been a model parent. Id. Consequently, trial courts are "obligated to maintain a preference for the parent retaining his or her parental rights." In re D.D.C., 351 S.W.3d 722, 729 (Mo. App. W.D. 2011). "The goal of a termination hearing is not to justify termination, but to determine if grounds exist for termination and if termination is in the child's best interests." K.A.W., 133 S.W.3d at 19. On review, appellate courts will closely examine the trial court's findings in a termination judgment, strictly construing the applicable statutes in favor of the parent and preservation of the natural parent-child relationship. K.A.W., 133 S.W.3d at 12.

To terminate one's parental rights, the trial court must find clear, cogent, and convincing evidence to support at least one of the statutory grounds set forth in Section 211.447. Id. at 9. Evidence is clear, cogent and convincing when it "instantly tilts the scales in favor of termination" when weighed against opposing evidence and leaves the fact-finder with the "abiding conviction that the evidence is true." Id. at 12. On review, courts must determine whether the grounds for termination were supported by substantial evidence that meets this test. In re D.D.C., 351 S.W.3d at 729. The judgment will be affirmed unless there is no substantial evidence to support it, it is

12

contrary to the evidence or it erroneously declares or applies the law. K.A.W., 133 S.W.3d at 11. Again, the evidence was largely undisputed in this case. To the extent there was conflicting or contradictory evidence, the facts will be viewed in the light most favorable to the trial court's judgment. See In re J.M.T., 386 S.W.3d at 158. Even then, evidence that is contrary to termination must be considered because termination must be supported by evidence that instantly tilts the scales in favor of termination *when weighed against the evidence in opposition* and the finder of fact is left with the abiding conviction that the evidence is true. In re T.L.B., 376 S.W.3d 1, 3-4 (Mo. App. S.D. 2011). The judgment will be reversed only if this Court is left with a firm belief that the order is wrong. D.D.C., 351 S.W.3d at 729.

This judgment is wrong. As Father argues on appeal, there was no substantial evidence to support the trial court's finding that his marijuana use constituted a chemical dependency as set forth in the statute. Therefore, that condition cannot support termination either on grounds of abuse or neglect or failure to rectify. But, whether or not his drug use was a chemical dependency, Father was supposed to become drug free under the service plan and produce clean drug screens under the court's orders. Father's refusal to comply could support termination on the failure to rectify ground only if there was also an adequate finding supported by substantial evidence that the drug use itself was potentially harmful to the child. There were no such findings connecting Father's use of marijuana to harm to the child. Moreover, the findings the trial court did make on the failure to rectify ground erroneously declared and applied the law.

**Abuse or Neglect**

To terminate on grounds of abuse or neglect, the court is required by statute to consider and make findings on the following conditions or acts of the parent:

(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can

13

be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;

(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.

Section 211.447.5(2). Here, the court found no evidence that Father had a mental condition or committed or knew of any severe or recurrent acts of abuse against the child. And it found that Father had provided the child with continuous financial support and other supplies and food evidencing an intent to contribute to his care.

The court then made extensive findings on Father's "chemical dependency." It began by finding that he "suffers from a chemical dependency which cannot be treated, or has not been treated, thereby preventing Father from consistently providing for the necessary care, custody and control of the child." The court expressly stated in bold: **"This is the condition upon which the termination of Father's parental rights rests."** The court then detailed the history of Father's marijuana use before and during the proceedings, his repeated failure to curtail his usage and his justifications for this refusal despite court orders and the fact that marijuana use by adults even for medicinal purposes is illegal in Missouri. The court stated that Father's conduct prevented his visits with the child from being expanded to longer unsupervised and overnight visits as a prelude to reunification. The court concluded by finding that there was clear, cogent and convincing

14

evidence that Father "suffers from a chemical dependency that could be treated, but that has not been treated due to Father's refusal to accept treatment services and his denial that treatment is necessary." Father's "refusal to address his chemical dependency and his refusal to accept the need for substance abuse treatment prevents him from consistently providing for the necessary care, custody and control of the juvenile."

"Poor conduct or character flaws are not relevant unless they could actually result in future harm to the child." K.A.W., 133 S.W.3d at 11. Without evidence that "clearly establishes" the parent's current condition and how it impacts the parent's "present and future ability to adequately parent" the child, the parent's "fundamental liberty interest in preserving the parent-child relationship is terminated on the basis of speculation instead of verifiable facts." In re C.W., 211 S.W.3d 93, 100 (Mo. banc 2007) (abrogated on other grounds by In re B.H., 348 S.W.3d 770, 777 (Mo. banc 2011)). Therefore, courts must also analyze the parent's conduct or condition for the following: (1) is there sufficient reason to believe that it had a detrimental impact upon the child, (2) does the conduct or condition and its accompanying impact on the child meet the requisite severity to support termination and (3) is there a likelihood of future harm to the child by continuing a relationship with the parent. K.A.W., 133 S.W.3d at 9-12. For some types of parenting conduct and conditions, the requisite impact and level of severity is specified in the statute itself. Id. at 11. Chemical dependency is one such condition.

Chemical dependency is of sufficient severity to support termination only if it (1) "prevents the parent from consistently providing the necessary care, custody and control over the child" and (2) "cannot be treated so as to enable the parent to consistently provide such care, custody and control." Id.; K.A.W., 133 S.W.3d at 11. In other words, not all chemical dependency is sufficient

15

to support termination. There must be evidence that the parent has an untreatable addiction that renders the parent unable to adequately care for the children.

First, the court did not indicate what evidence it relied upon in reaching the conclusion on which this entire factor is premised: that Father's marijuana use was an actual "chemical dependency." The juvenile officer argues that dependency can be inferred from the evidence of Father's consistent use of this drug and his unsupported justifications for his use, showing that Father was just a "garden variety pothead" who refused to quit. The evidence certainly shows that Father *would* not stop using marijuana, but it does not show that he *could* not stop. There was no evidence of a dependency. No one opined that Father had an addiction. Nor is it necessarily true that Father's diagnosis of "cannabis abuse" equates to a conclusion of cannabis dependence. See In re I.G.P., 375 S.W.3d 112, 129 (Mo. App. W.D. 2012) (mother's abuse of marijuana and alcohol diagnosed as polysubstance abuse, cannabis dependence and alcohol dependence); In re C.M.H., 408 S.W.3d 805, 812 (Mo. App. S.D. 2013) (psychologist opined that mother used marijuana all the time, chronically used methamphetamine and regularly used alcohol and diagnosed cannabis dependence, methamphetamine abuse and alcohol dependence). Surely one can abuse a substance, even repeatedly, without being dependent on it or addicted to it. For instance, in In the Interest of S.T.C., there was evidence that mother used and abused drugs in the past and during pregnancy and that, at the time of termination, she admitted to using marijuana. 165 S.W.3d 505, 514 (Mo. App. S.D. 2005). But there was no testimony that she had a "chemical dependency" at the time of termination and thus the court's finding was unsupported. Id.

Second, even assuming it did amount to an addiction, there is no evidence or even findings by the trial court that Father's marijuana use itself—as opposed to his "pigheaded" refusal to produce a clean drug screen—prevented him from providing adequate care for the child. At all

16

relevant times, Father maintained a job, had a suitable home ready for the child and consistently provided for the child's needs. It is undisputed that Father had consistently appropriate visits with the child, in which he fed, played with, talked to, disciplined when necessary and encouraged the child. Father was able to care for the child at those visits, even though he was also using marijuana during that time period outside of the child's presence. There was no evidence that he was ever under the influence of marijuana in the child's presence. Here, concluding the Father is unable to provide care for the child is contrary to the evidence of his ongoing financial support and physical capabilities at his supervised visits. See id., 165 S.W.3d at 514 (noting that when child is removed from parent at birth, difficult if not impossible for court making finding regarding parent's ability to care for child based only on hour-long supervised visits, at least without other evidence concerning ability, physically or financially, to provide for child).

Third, the trial court's findings regarding treatment for this condition are internally inconsistent and contradicted or unsupported by the evidence. At the outset, the court found that Father's chemical dependency "*cannot be* treated, or has not been treated." (emphasis added). Later in those same findings, the court said Father's chemical dependency was one that "*could be* treated, but that has not been treated due to Father's refusal to accept treatment services and his denial that treatment is necessary." (emphasis added). There is not substantial evidence to support either the conclusion that the condition could be treated or the conclusion that it could not be treated. First, there is no evidence that any drug treatment services were ever recommended or offered to Father. Though the Division's investigative report and social study provided to the court at termination indicates that Father's first case manager gave him "referrals for substance abuse treatment," the reports she filed with the court indicate that she only ever referred Father to

17

substance abuse *evaluations*. She was no longer assigned to the case by the time Father actually underwent that evaluation in April of 2013.

Second, Father was required by court order and the Division's service plan only to participate in substance abuse evaluation and follow the recommendations therefrom. The parties stipulated that the evaluation occurred and that "no services were recommended from the substance abuse evaluation as [F]ather reported he did not have a substance abuse problem."[5] A person's acceptance of a drug problem and willingness to get help may be an important factor in the success of any drug treatment program. But the value and weight to be given an evaluation that would base its determination of whether Father needed drug treatment services on whether Father believed them necessary or not, not on whether the evaluator believed them necessary, is questionable. If treatment was needed, it should have been recommended. Then, if Father refused to attend the treatment program or was unsuccessful, those facts would be relevant to whether the chemical dependency was untreatable. But without evidence that Father was ever advised to undergo treatment, it is simply impossible to conclude whether he could or could not be treated.

D.D.C. is instructive on this issue. There, the father had an extensive history of illegal methamphetamine use, including in the home while the child was present, and admitted to abusing alcohol. 351 S.W.3d at 726-27. He tested positive for methamphetamine at the time of the termination hearing, after which his parental rights were terminated based in part on a finding of chemical dependency under the abuse or neglect ground. Id. at 728-30. On review, the court of appeals found that no one opined that the father "had an addiction that could not be treated." Id. at 730. Evidence that he had gotten clean for a period of time, maintained employment, consistently pursued custody and attended visitation regularly also belied any finding of an

---

[5] Likewise, the psychologist who diagnosed "cannabis abuse" did not recommend treatment. She only might recommend treatment if Father repeatedly tested positive for high levels of marijuana, of which there was no evidence.

18

untreatable addiction. Id. Moreover, the court found that while illegal drug use is concerning, it is not grounds for termination, nor is every chemical dependency. Id. Only an untreatable chemical dependency is sufficient, and, like here, there was no evidence that treatment services were suggested or offered to the father. See id. Moreover, there was no clear cogent and convincing evidence that the father refused services, despite his indication that he did not believe he would benefit from drug treatment. Id. Thus, like in D.D.C., this was not a case where treatment was attempted and failed thereby proving the existence of an untreatable chemical dependency that prevented Father from parenting.

Clear, cogent and convincing evidence of a chemical dependency under the statute includes evidence such as a diagnosis of dependency, a pattern of drug use, treatment attempts and relapse, or expert opinions regarding—or direct instances of—the impact the drug use has on the child. For instance, in I.G.P., the mother testified that she began using illegal substances at the age of sixteen and had already been using alcohol since age six, with heavy use of alcohol since age twelve. 375 S.W.3d at 129. She consistently abused marijuana and alcohol for many years prior to the termination and was diagnosed with polysubstance abuse, cannabis dependence and alcohol dependence. Id. She participated in substance abuse treatment programs, but failed to remain sober. Id. Her abuse of substances led to the loss of her parental rights to two other children and she used illegal substances and alcohol during pregnancy and engaged in domestic violence in the children's presence. Id. The mother's continued use of alcohol led to impaired judgment, unsafe decision making and altercations with her boyfriend, leaving her in an unsafe place physically and emotionally. Id. Alcohol abuse led to leaving the child unattended and unable to be located while at a party, blacking out, being abused by men, falling and breaking her leg and attempting suicide while caring for the child. Id. The mother admitted that she is totally incapable of providing care

for her child when under the influence of alcohol. Id. During her testimony, the mother said she had even used marijuana the previous evening and that during the trial, she had used marijuana daily, sometimes twice daily on the weekend, and was not trying to quit using marijuana. Id. Her therapist, an expert in the field, testified that the mother's continued use of marijuana exacerbates her anxiety, increasing the risk of harm to herself and the child. Id. This record showed that the mother's ability to care for his child "is intrinsically linked to her own instability and that her continuing abuse of marijuana and alcohol, and refusal to get treatment, prevents her from consistently providing the necessary care, custody and control over [the child]." Id. at 129-30.

No such similarly clear, cogent and convincing evidence connecting Father's marijuana use to an inability to care for the child or showing it to be an untreatable addiction exists here. Strictly construing the statute as is required, there was no substantial evidence that Father's marijuana use was a "chemical dependency" sufficient to support the abuse or neglect ground for termination under Section 211.447.5(2). The trial court found no other factors supporting termination on that ground. The juvenile officer failed to prove by clear cogent and convincing evidence that Father abused or neglected the child, and the judgment must be reversed on that ground. Point I is granted.

**Failure to Rectify**

As to the failure to rectify ground, the child must have been under the jurisdiction of the court for one year, which is undisputed in this case. The court must then also find:

> that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

20

Section 211.447.5(3). After making the initial findings regarding the harmful condition, the court must then consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control.

Section 211.447.5(3). Here, the court found no mental condition and entered identical findings regarding Father's chemical dependency as it had on the abuse or neglect ground. Those findings cannot support termination on this ground either. But the court also made findings under factors (a) and (b), and, thus, we must review this ground to determine if it is adequately supported.

The initial paragraph of the failure to rectify provision has been correctly interpreted to require the trial court to make the following two findings, each on the basis of one of two possibilities: (1) that *either* "the conditions which led to assumption of jurisdiction still persist" *or* "conditions of a potentially harmful nature continue to exist" *and* (2) that either "there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future" *or* the "continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." In re

21

B.J.K., 197 S.W.3d 237, 243 (Mo. App. W.D. 2006) (citing In the Interest of A.R., 52 S.W.3d 625, 640-41 (Mo. App. W.D. 2001)); accord In re A.L.M., 354 S.W.3d 645, 653 (Mo. App. S.D. 2013).

Here, the court found that "(1) the neglect/abuse conditions that lead to adjudication persist *or* (2) conditions of a potentially harmful nature continue to exist *or* (3) the continuation of the parent/child relationships greatly diminishes the child's prospects for early integration into a stable and permanent home." (emphasis added). It appears the trial court was simply tracking the language as pled in the juvenile officer's petition on this ground, and other courts have incorrectly paraphrased the necessary findings under this provision as well. But when analyzed carefully as the court did in B.J.K., it is clear that the plain language of the provision contains unambiguous "signposts" that lead to a logical scheme. 197 S.W.3d at 244. The word "that" precedes each of the two required findings; within each, the possibilities are stated in the disjunctive with the word "or." Id. The first required finding focuses on the nature of the child's present and future conditions, whether it is the condition that led to jurisdiction or another potentially harmful condition. Id. at 245. The second required finding focuses on whether that condition "doom[s] the child's prospects for living in an acceptable environment," either because the condition is unlikely to be remedied so that the child can return to the parent or because continuing in the relationship with the parent under that condition will make it harder for the child to achieve a stable and permanent home somewhere. Id.

This scheme is not only a logical reading of the statute, but is consistent with one of the essential considerations in any termination case, namely the existence of a harmful condition presently or in the future. See id.; see also K.A.W., 133 S.W.3d at 9. Because each of the trial court's findings here are stated in the disjunctive, it suggests there were three alternative basis for termination without indicating on which one the trial court actually relied. Significantly, that

22

would mean that Father's rights may have been terminated based on *only* a finding that continuing his relationship with the child hindered the child's integration into a stable and permanent home, without any finding regarding a harmful condition. This result would be absurd as it completely ignores the existence of a present and future harm to the child. See B.J.K., 197 S.W.3d at 245.[6] Moreover, there was no evidence to suggest that the child's relationship with Father impeded his development or his chance at a stable home—his relatives who had custody of the child planned to adopt the child if needed. See S.T.C., 165 S.W.3d at 516

Though this erroneous declaration and application of the initial provision of Section 211.447.5(3) was not raised on appeal, given the seriousness of the termination of parental rights, it can be reviewed for plain error. The error here is plain and obvious, and termination without clear, cogent and convincing evidence of a harmful condition would be a manifest injustice or miscarriage of justice. See In the Interest of D.F.P., 981 S.W.2d 663 (Mo. App. S.D. 1998). Moreover, the trial court's findings are general and merely track the language of the statute, which is also inadequate. See In re H.F.G., 196 S.W.3d 45, 48 (Mo. App. W.D. 2005).

As a result of this error, the other findings on this ground are also insufficient. In addition to the threshold findings regarding the harmful condition and its impact on the child's chance to get in an acceptable living environment, there are four factors the trial court must consider, any one of which is a condition or act that may have a negative impact on a child. In re G.G.B., 394 S.W.3d 457, 468 (Mo. App. E.D. 2013). These factors "are not separate grounds for termination by themselves, but rather categories of evidence that the court may consider along with all other

---

[6] To the extent other courts have paraphrased the statute in a way that leads to a similar result, they have done so without analysis. See In the Interest of K.D.H., 871 S.W.2d 651, 656 (Mo. App. W.D. 1994); In the Interest of B.L.H., 158 S.W.3d 269, 277 (Mo. App. E.D. 2005); In the Interest of V.C.N.C., 458 S.W.3d 443, 449 (Mo. App. E.D. 2015). As was held by the court in B.J.K., such incorrect recitations of the statutory requirements of Section 21.447.5(3) should not be relied upon or followed. 197 S.W.3d at 245.

relevant evidence in determining whether grounds for termination exist under Section 211.447.5(3)." In Interest of S.D., 472 S.W.3d 572, 577 (Mo. App. W.D. 2015). Although the court must make findings on all factors, proof of just one factor is sufficient to support termination of parental rights. Id.

Regarding factor (a), the trial court found that the key elements of the service plan prepared by the Division were Father's "participation in substance abuse evaluation, substance abuse treatment and random drug screens." It found that Father failed to yield a single clean drug screen during the pendency of this case and denied the existence of a problem or the necessity for evaluation and treatment and consequently "did not participate in these services." The court also found that to the extent Father did comply with the service plan, his and the Division's efforts "proved unsuccessful in providing a continuing relationship between the Father and the child and in reunifying" them. Regarding factor (b), the court found that the Division's efforts to help Father were reasonable, yet Father failed on a continuing basis "to adjust his circumstances or conduct to provide a proper home for the child." "Said failure is demonstrated by Father's inability to produce a single clean drug screen throughout this process despite Father's knowledge that clean screens were required for expansion of his visitation with the juvenile."

Social service plans provide highly relevant evidence because the extent to which a parent has or has not made an effort to accomplish the plan's goals can help predict the effort a parent will put forth in the future to care for the child or predict other future problems In re S.M.H., 160 S.W.3d 355, 368 (Mo. banc 2005). The issue in termination of parental rights cases is whether progress has been made toward the plan goals, not whether there has been full or even substantial compliance. See id. at 369. Failure to comply with parts of the service plan is not grounds for automatic termination, nor does partial compliance with a service plan prevent termination. See

id.; see also B.L.H., 158 S.W.3d at 279. Nevertheless, failure to achieve progress towards the terms of a social service plan can alone support termination but only when the harmful condition underlying termination is left uncorrected as a result. In re I.G.P., 375 S.W.3d at 121. That is, the court and the Division can require any number of things from a parent, but only when a parent's non-compliance with those requirements leaves a *harmful condition* untreated can that conduct support termination. If the mere failure to comply with court orders or the Division's directives— no matter what they required—was alone sufficient to terminate, then the statute would say so. Instead, as discussed above, the presence of a harmful condition presently or in the future is the essential consideration in termination cases. Likewise, had the legislature wanted to make all illegal drug use *ipso facto* a ground for termination it could have. But again it did not. Only conditions that are found based on the clear, cogent and convincing evidence to be harmful to the child can support termination.

There have certainly been cases in which such findings were made and easily supported by substantial evidence. In B.L.H., for instance, the trial court relied on factors (a) and (b) to support its failure to rectify ground, which was premised on the harmful condition presented by the mother's daily marijuana use, for which she was offered treatment but failed to complete, and by her failure to obtain suitable housing. 158 S.W.3d at 278-79. The child and the mother had tested positive for marijuana at the time of the child's birth, and within the child's first month at home in mother's custody, he suffered a non-accidental serious injury that mother could not explain. Id. at 279. This was the condition that led to jurisdiction and persisted and constituted a potentially harmful condition because the mother showed no progress in addressing her marijuana use. Id. Thus, while the evidence here did not show that Father's drug use amounted to a chemical dependency, it certainly could have constituted a potentially harmful condition. But there must be

25

a finding connecting the drug use to harm to the child and clear, cogent and convincing evidence to support it.

Here, there was no such finding, and the evidence did little more than demonstrate the potential and inherent risks of using any illegal mind-altering substance: namely, that using marijuana while driving may pose a risk of physical harm to a child in the car and, because it is illegal, there is also a potential risk of legal problems. But these potential risks of smoking marijuana—even if they are inherent or obvious or a matter of common sense—were simply not the thrust of the trial court's concern or the basis of any of its actual findings in this judgment. Rather, the court's main problem with Father was his stubborn refusal to follow the court's orders and the Division's plan and his immature rationalizations for his behavior. Regardless of how frustrating Father's conduct was throughout these proceedings, it is not enough to simply say that Father did not meet a goal of the service plan and did not adjust his circumstances to become and remain drug free without also making an explicit finding based on clear, cogent and convincing evidence that use of the drug was itself a potentially harmful condition.[7]

If such findings were made and supported, then there was ample undisputed evidence—at least on this record—that the harmful condition was intentionally left uncorrected by Father's non-compliance with the service plan and his failure to adjust his circumstances. See Section 211.447.5(3)(a)-(b). But because the findings are absent or insufficient, the judgment must be reversed on the failure to rectify ground. Point II is granted.

---

[7] Father has made poor and selfish choices since the child came into custody. But that is not grounds for termination or even a factor to be considered when determining if there are grounds for termination. To the extent his bad judgment demonstrates a lack of commitment to the child, that behavior can be considered in the best interest analysis, *after* grounds for termination have been established. See 211.447.7. Because the grounds for termination were unsupported here, and reversal is on that basis, Father's challenge to the best interest findings is not reached. Point III is moot.

26

Reversing this termination is not intended to condone Father's marijuana use—or any parent's illegal drug use or abuse of drugs or alcohol—any more than it condones his obstinate refusal to follow the court's orders. But in *this* judgment and on *this* record, there is a troubling combination of misstatements or misapplications of the statutory requirements and insufficient or unsupported findings of the factors to support grounds for termination. Given the gravity and finality of termination, this judgment cannot be affirmed with these deficiencies.

**Conclusion**

The judgment terminating Father's parental rights is reversed, and the case is remanded for further proceedings including additional services, hearings, and findings. Any further findings on remand must be based on updated evidence, particularly regarding Father's drug use. The conclusions here are based solely on the record before us, which contains evidence that is now well over a year old. One cannot speculate as to what may have changed during the pendency of this appeal or what the evidence would be at the time of any future proceedings to terminate. See In re Z.L.R., 306 S.W.3d 632, 638 (Mo. App. S.D. 2010).

ROBERT G. DOWD, JR., Presiding Judge

Mary K.Hoff, J., concurs in result in separate concurring opinion.
Roy L. Richter, J., concurs in separate concurring opinion of Mary K. Hoff, J.

27



# In the Missouri Court of Appeals

## Eastern District

### DIVISION ONE

IN THE INTEREST OF:                 )        No. ED103681
                                    )
K.M.A.-B.                           )        Appeal from the Circuit Court
                                    )        of St. Louis County
                                    )
                                    )        Honorable Thea Anne Sherry
                                    )
                                    )        Filed: July 12, 2016

### OPINION CONCURRING IN RESULT

I concur in result.

The trial court terminated Father's parental rights based on the same statutory ground (chemical dependency) under Section 211.447.5(2)b (abuse and neglect) and Section 211.447.5(3)d (failure to rectify). The trial court's judgment, finding of facts, and conclusions of law found that he (Father) "suffers from a chemical dependency which cannot be treated, or has not been treated, thereby preventing Father from consistently providing for the necessary care, custody, and control of the child. **This is the condition upon which termination of Father's parental rights rest.**" (Emphasis in original).

I generally agree with the procedural and factual history found in the Honorable Robert G. Dowd, Jr.'s opinion.

After a review of the record and the trial court's judgment, I find that there is insufficient evidence to support the finding that Father had a chemical dependency which cannot be treated and that would prevent Father from providing for the care of the child.

While Father's illegal drug use presents significant concerns, the required level of severity the court must find is specified by the statute. In Re: K.A.W., 133 S.W.3d 1, 11 (Mo. banc 2004). Under Section 211.447.5(2)b, drug use alone is not grounds for termination nor is chemical dependency, rather, the statute provides that termination requires a chemical dependency which cannot be treated. In the Interest of D.D.C., 351 S.W.3d 722, 726 (Mo. App. W.D. 2011).

In this case, there is no evidence that drug treatment was ever recommended or offered to Father, nor that he refused treatment. This is not a case where treatment was attempted and failed. As a result, it is hard to draw a conclusion from this record that Father suffered from a chemical dependency, much less that this was a harmful condition that could not be treated.

In order to meet the high burden to terminate Father's parental rights, the court's judgment must be based on clear, cogent, and convincing evidence to support at least one of the statutory grounds set forth in Section 211.447. K.A.W. at 9. This burden has not been met in this case. See In the Interest of S.T.C., 165 S.W. 3d 505, 514 (Mo. App. S.D. 2005).

This decision is based only on the insufficient evidence to support the necessary requirements under the statute for termination of parental rights.

_Mary K. Hoff_
Mary K. Hoff, Judge

2