IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 10, 2024

**STATE OF TENNESSEE v. TRAVIS ANDREW HARRIS**

**Appeal from the Criminal Court for Davidson County**
**No. 2020-A-407      Cheryl A. Blackburn, Judge**

_____

**No. M2023-01625-CCA-R3-CD**
_____

Defendant, Travis Andrew Harris, was convicted of first degree premeditated murder and possession of a firearm by a felon convicted of a violent crime. The trial court imposed an effective sentence of life plus twelve years. On appeal, Defendant contends that the evidence at trial as to his premeditation and identity was insufficient to support his murder conviction. We conclude that the evidence was sufficient and affirm Defendant's conviction. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Jay Umerley, Nashville, Tennessee, for the appellant, Travis Andrew Harris.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Trial*

Defendant was charged by indictment for the shooting death of Quenton Brooks.[1] Lenora Wigfall was dating Defendant at the time of the shooting, and she shared a six-

_____

[1] In a superseding indictment, Defendant was also charged with possessing a firearm after having been convicted of a felony crime of violence. Defendant was convicted of that offense following a bifurcated trial at which the parties stipulated that "[o]n December the 6th, 2012, the defendant . . . was

year-old son with the victim. Ms. Wigfall had custody of their son during the school year, and the victim had custody during the summer. On the day of the shooting, July 10, 2018, Ms. Wigfall and the victim exchanged text messages and phone calls. Ms. Wigfall said the conversations "were normal for a bit" and then "started to get a little heated back and forth due to a conversation about food stamps." Ms. Wigfall and Defendant "were just riding around" in her car, and Defendant overheard the conversation between Ms. Wigfall and the victim. Defendant told them they "needed to wrap up the conversation if it wasn't about [their] child." The victim became angry and said, "I don't need another grown man telling me to shut up or stop talking."

Later, Defendant took Ms. Wigfall's phone and began using it, which Ms. Wigfall testified was not unusual for him to do. That night, Defendant told Ms. Wigfall to drop him off at the McFerrin Park Community Center in Nashville. Ms. Wigfall asked Defendant why he wanted to be dropped off there, and he "didn't say anything." Defendant kept her phone when he got out of the car. He was wearing blue jeans, a black t-shirt, a fitted cap, and white tennis shoes. Ms. Wigfall left to get something to eat. When she returned to the community center, Ms. Wigfall saw the victim's car and the parking lot was "surrounded by police officers and [an] ambulance." She eventually found Defendant walking down the street and picked him up. He would not tell her anything about what had happened.

On cross-examination, Ms. Wigfall testified that she did not see Defendant with a gun that day. She also testified that she had seen Defendant lean against the victim's car on a prior occasion. Defendant and the victim had been around each other before, and Ms. Wigfall agreed that their interactions went "very smoothly."

An extraction of Ms. Wigfall's cell phone revealed text messages between the victim and Defendant on the day of the shooting. At 7:25 p.m., Defendant told the victim to "stay in yo lane" and to "keep it short" when the victim communicated with Ms. Wigfall. The victim responded, "Is this travis bruh? If so we can talk like men homie. Face to face on some real sh[**] ya feel cause u can't [t]ell me when [I] call to keep it short[.]" At 7:48 p.m., the victim texted, "u can call me homie we grown a[**] men we can rap when u feel free[.]" At 8:07 p.m., the victim asked, "Where yal tryna meet we all need this talk homie[,]" and suggested Ms. Wigfall come too. Defendant said, "Naw cuz we going to meet up[.] Me n u homie[.]" At 8:34 p.m., Defendant told the victim to meet him at the McFerrin Center. At 8:35 p.m., Defendant said, "I'm here[.]" At 8:39 p.m., the victim texted, "Bout 10 min away homie[.]"

---

convicted of a felony involving the use of attempted use of force, violence, or a deadly weapon." Defendant does not challenge this conviction on appeal.

- 2 -

Several individuals who were playing tennis beside the McFerrin Park Community Center that night witnessed the shooting. Summer Moltzan heard "loud shots ringing from the direction of the parking lot of the community center." She saw a man holding a gun, pointing it toward a vehicle that was "slowly backing away[,]" and she saw "orange sparks" of gunfire. Ms. Moltzan was unable to identify the shooter but testified he was wearing black clothing. She believed she heard around five gunshots. Robert Gideon saw the man "shooting through the passenger side" of the vehicle. After the shooter fled on foot, he saw the driver "slump out of the car and then onto the ground [ ] near the sidewalk." Mr. Gideon called 911 and attempted to render aid to the victim, who was unresponsive.

Officers from the Metro Nashville Police Department responded to the scene and found the victim lying on the ground "covered in blood." He was transported to Vanderbilt University Medical Center, where he was pronounced dead. An autopsy revealed that the victim suffered a single gunshot wound to his chest. The bullet entered the left side of his body and pierced a rib, a lung, and his aorta before lodging in the victim's spine.

Detective Cressie Prill was the lead investigator in the case. She observed the victim's vehicle, "which had come to rest with its back wheels against a curb with the reverse lights still on." The vehicle had bullet holes in the front windshield, and the passenger side window was "shattered." Police found several 9-millimeter cartridge casings on the ground and a cell phone near the casings "along the path that was determined to be where [D]efendant had run." The cell phone was later identified as belonging to Ms. Wigfall. The shell casings were determined to have all been fired from the same weapon. Bullet fragments were recovered from the victim's vehicle. The bullet fragment that was recovered from the victim's spine was too damaged to determine its caliber or whether it was fired from the same weapon as the projectiles recovered from the victim's car. Detective Prill testified that no weapon was found on or around the victim or inside his vehicle. Defendant's latent fingerprints were found on the driver's side hood of the vehicle.

Police obtained security video footage of the community center parking lot, which was admitted as an exhibit and shown to the jury. The video showed a person wearing a dark shirt, dark pants, and white shoes shooting at the victim's vehicle before running away. At trial, Ms. Wigfall identified her car and Defendant in the surveillance video. Ms. Wigfall also gave a statement to police that was consistent with her testimony at trial. Police obtained a warrant for Defendant's arrest and located him more than two weeks later at an apartment complex in Sumner County.

*Analysis*

Defendant contends that the evidence was insufficient to support his conviction for first degree premeditated murder because, he argues, the evidence "did not show that [he] acted with the necessary reflection or judgment to justify a conviction for premeditated murder." Defendant also asserts that the evidence "did not establish [his] identity as the shooter beyond a reasonable doubt." The State asserts that the proof at trial overwhelmingly established Defendant's guilt. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This Court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id*. § 39-11-302(a). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time."

- 4 -

*Id*. § 39-13-202(d). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*. Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). These circumstances include, but are not limited to:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing.

*State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citing *Bland*, 958 S.W.2d at 660; *State v. Pike*, 978 S.W.2d 904, 914-15 (Tenn. 1998)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted). In addition, a jury may infer premeditation from a lack of provocation by the victim and the defendant's failure to render aid to the victim. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) *abrogated on other grounds by State v. Thomas*, 687 S.W.3d 223 (Tenn. 2024). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *Davidson*, 121 S.W.3d at 614 (citing *Suttles*, 30 S.W.3d at 261; *Pike*, 978 S.W.2d at 914).

Viewed in the light most favorable to the State, the evidence showed that Defendant arranged to meet the victim at McFerrin Park, where Defendant arrived first and waited for the victim to arrive. Defendant then shot the unarmed victim, who was still inside his vehicle, and fled the scene without rendering aid to the victim. Communications between Defendant and the victim on the day of the shooting showed that the victim sought only to talk to Defendant and did not provoke Defendant. From all of this, a rational juror could conclude that Defendant intentionally killed the victim with premeditation.

Defendant asserts that the communications between the victim and Defendant "leading up to the incident suggest[] that the encounter was spontaneous rather than planned" because there were no threats made. We disagree. The communication between Defendant and the victim established that the victim wanted to talk to both Defendant and Ms. Wigfall about their problems. Defendant then lured the victim to the park and went there without Ms. Wigfall. Defendant concedes "a lack of provocation" by the victim, but he asserts that "the absence of provocation does not exclude the possibility that [Defendant]

acted impulsively or out of fear." Defendant also concedes that he "fled the scene after the shooting," but asserts that the State failed to prove that he "took deliberate steps to hide the crime," and that his "departure from the scene could just as easily indicate panic or fear. . . ." The lack of provocation and Defendant's fleeing the scene, however, along with other circumstances, sufficiently established premeditation. The proof at trial showed planning on Defendant's part, and motive could be reasonably inferred from the prior relationship between the victim and Defendant and Defendant's conduct toward the victim.

Defendant also contends that the evidence was insufficient to establish his identity as the shooter. The identity of the perpetrator is an essential element of any crime and may be established based solely upon circumstantial evidence. *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021). Identity is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167. 198 (Tenn. 2015).

The proof in this case of Defendant's identity as the shooter was overwhelming. Defendant told the victim to meet him at the park, and Ms. Wigfall dropped him off at the park a short time later. Defendant kept Ms. Wigfall's phone, which police found at the scene of the shooting. Witnesses described the shooter's clothing, which matched Defendant's clothing on that night. Defendant's fingerprints were found on the victim's car. Ms. Wigfall identified Defendant in surveillance video that captured the incident, and the video was shown to the jury. From all of this, a rational juror could reasonably have found that Defendant was the shooter. Defendant is not entitled to relief.

CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

s/ Timothy L. Easter
TIMOTHY L. EASTER, JUDGE

- 6 -