IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 2, 2024

**STATE OF TENNESSEE v. MARIO ROGERS**

**Appeal from the Criminal Court for Shelby County**
**No. 19-05138, C1907166   Carolyn W. Blackett, Judge**

_____

**No. W2023-01310-CCA-R3-CD**
_____

Defendant, Mario Rogers, appeals his conviction for second degree murder, arguing that the evidence was insufficient to support his conviction because the State failed to establish his identity as the perpetrator or that he acted with the requisite mental state.  Upon review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and JOHN W. CAMPBELL, SR., JJ., joined.

Claiborne Ferguson, Memphis, Tennessee, for the appellant, Mario Rogers.

Jonathan Skrmetti, Attorney General and Reporter; Katherine Orr, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Carrie Bush and Sara Poe, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On October 17, 2017, between 11:00 p.m. and 1:00 a.m., Yolanda Street and Defendant, her boyfriend, were outside of the "Yellow Store," and Ms. Street was talking with another woman, "T.K."[1]  A man unknown to Ms. Street wanted T.K. to leave with him.  When T.K. refused to leave, the unknown man became "aggressive" and "kept zapping something" in his pocket.  Ms. Street told Defendant that they should leave, but he did not want to leave.  Defendant told the man that T.K. would leave when she was

_____

[1] The record does not contain any other identifying information about T.K.

ready. In an attempt to de-escalate the situation, Ms. Street stepped between Defendant and the man. The man then pulled a taser from his pocket and tased Ms. Street, causing her to fall to the ground. The man fled and Defendant chased after him on foot. When Defendant could not catch up to the man, Defendant got into his blue van to go after him. Defendant returned about five minutes later and told Ms. Street to get in the van. "Mimi," a person who had been nearby when Ms. Street was tased, helped Ms. Street into the van; Mimi also got into the van. Defendant told Ms. Street that he "got that n****[;]" Ms. Street thought that meant Defendant and the man had fought.

While Defendant was driving the van, Ms. Street, Defendant and Mimi saw ambulances, so Defendant parked the van behind an apartment complex, and all three walked to see what was going on. Ms. Street saw a person she knew as "Baby Face," who told her that someone had been hit and that Defendant had "hit the wrong person[;]" however, she could not get close enough to see who had been hit. Ms. Street, Mimi, and Defendant then got back into the van. Ms. Street got into the driver's seat and noticed that the van's windshield was cracked. Ms. Street explained that earlier in the night, Defendant's van "had tape in the front," but the windshield had not been cracked. Ms. Street asked Defendant what happened, and he said, "I told you, I got him." Ms. Street drove to the apartment complex where she and Defendant lived and parked in the back where the apartment was located. Ms. Street and Mimi then went to a store nearby and smoked some cigarettes before they returned to the apartment and both went to sleep. A short while later, the police arrived at the apartment and told her and Defendant that they had to go to the police station because "the vehicle in the back had been involved in a crime."

In her police interview, Ms. Street stated that she "asked [Defendant] what happened to the windshield and [Defendant] said, I told you I got him. Get in." Ms. Street identified a picture of Defendant's van shown to her by police, and noted that there was not blood on the windshield. Ms. Street testified that she did not know the victim who had been identified as Curtis Blackmon, but stated that the victim was not the man who tased her.

On cross-examination, Ms. Street stated that it was not unusual for her and Defendant to be out late at night. She described the unknown man who tased her in the Yellow Store as "taller than normal," "kind of" aggressive when he spoke to T.K., and had physically pushed his way into Ms. Street's "personal space." Ms. Street agreed that she thought that the man had used the taser as a threat throughout the interaction, and she thought Defendant was going to fight the man to protect her. Ms. Street stated that Defendant was "mad" when he drove away in the van and was still "mad" when he returned to pick her up, but Defendant did not state that he killed or wanted to kill someone. Ms. Street explained that while on the accident scene, she attempted to walk toward the ambulance but could not get there because there were too many people. Ms. Street did not

see the man on the ground, but knew that it was not the man who tased her because she had seen the man who tased her again later that night.

On October 17, 2017, Scharmelle Branklin was walking to the Yellow Store to purchase alcohol when she saw a crowd of people running toward her. Ms. Branklin saw "a girl hitting the ground" before Ms. Branklin was almost struck by a van. Ms. Branklin testified that she immediately recognized Defendant as the driver and the van as Defendant's van because she had previously been in the van with Defendant; at trial, she identified Defendant as the driver of the van. As the van drove away, Ms. Branklin looked at the license plate number so she could give the number to police. She then saw Defendant continue driving down the road before making a "U-turn" and hitting the victim as he walked in the bike lane. Although Ms. Branklin had not been at the Yellow Store when Ms. Street was tased, she testified that she knew Defendant intended to hit a man who was "about 6'2, 6'3 wearing a . . . brown leather jacker, [and] black jeans"; she did not explain how she knew this information. She was "astounded" that Defendant struck the victim because the victim did not match the description of the man Defendant intended to strike. She testified that it seemed that Defendant "just didn't care who he ran[] over[.]" Ms. Branklin explained that there were two men "running faster than the rest of the crowd . . . that's who [Defendant] had to be intending on hitting[.]" As Ms. Branklin began to testify how she knew who Defendant had intended to hit, the trial court sustained Defendant's hearsay objection and Ms. Branklin did not testify further on that issue.

Ms. Branklin estimated that Defendant was traveling at thirty-five or forty miles per hour when he struck the victim, and the force of the impact caused the victim to "slam into . . . the cement light post." Because she did not have a phone, Ms. Branklin asked someone nearby to call 911; she then went to check on the victim. Ms. Branklin placed her hand on the victim's hand and observed that "he was snoring" which she knew was the type of sleep that "people go into after seizures [when] there's no consciousness at all[.]" While Ms. Branklin was waiting with the victim for the ambulance to arrive, she saw Ms. Street drive Defendant's van to the scene with Defendant in the passenger seat. Ms. Branklin stated that Defendant "looked down as if he just looked and noticed something on the floor." While at the scene, Ms. Branklin gave a Memphis Police Department ("MPD") officer the license plate number of the van that hit the victim. Ms. Branklin later identified Defendant in a photographic lineup as the driver of the van. At trial, the photographic lineup was admitted into evidence as was a photograph of the license plate of the van Ms. Branklin identified. Ms. Branklin testified that she was a recovering addict, but had been sober since she witnessed this event, approximately four years at the time of trial, because it showed her that "[i]t's real out there. It's nothing to play with."

On cross-examination, Ms. Branklin clarified that she did not witness Ms. Street get tased and did not know at the time that the woman she saw on the ground at the Yellow

Store was Ms. Street. She admitted that she did not speak to either Ms. Street or Defendant except to tell them that Defendant had hit the wrong person. Ms. Branklin agreed that the time between when she saw the crowd of people running toward her and when she saw the victim get hit by the van was a short amount of time. On redirect examination, Ms. Branklin reaffirmed that she was positive that Defendant was the driver who had hit the victim.

Karonda Kirkwood, a supervisor with Memphis 911, identified a disc containing four 911 calls placed from the area of Cleveland Drive and Jefferson Avenue on October 17, 2017. The 911 calls were played for the jury. Each caller relayed that a pedestrian had been hit by a vehicle. One caller described the pedestrian as struggling to breathe and trembling, but there was no visible blood. Another caller provided a description of the clothing that the victim was wearing. Another caller described the vehicle as a dark blue Chrysler van with a crack in the windshield from hitting the victim and provided the van's license plate number. The fourth caller did not see the accident but witnesses at the scene told him to call 911 for an ambulance because a man had been hit by a vehicle at "high speed."

Melvin Dickson, a City of Memphis firefighter, responded to the scene near the intersection of Cleveland Street and Court Street. When he arrived, the victim was "unresponsive with snoring respirations." Mr. Dickson explained that "most of the time when [first responders] find a patient with snoring respiration, they're not protecting their airway." Mr. Dickson administered Narcan because in "the area [of the accident] . . . sometimes we find unresponsive patients on the ground. We try and give them Narcan just in case they may have been under the influence[,]" but the victim did not respond. Mr. Dickson agreed that what he observed on scene and the condition of the victim was consistent with a pedestrian having been struck by a vehicle as reported in the 911 calls. Mr. Dickson did not see physical injuries, other than abrasions on the victim's hands, and did not see blood. He agreed that injuries "vary from scene to scene," and not every accident scene will have blood present.

Sergeant Phillip Logan, with MPD's Special Traffic Investigation Squad, responded to the accident scene. The victim had already been transported to the hospital when he arrived, but Sergeant Logan noted that one of the victim's shoes was still on scene. Sergeant Logan created a not-to-scale diagram of the accident scene based on witness accounts. In creating the diagram, Sergeant Logan measured from the point of impact to Court Street and to Cleveland Street; from where the victim's shoe was recovered to Court Street and to Cleveland Street; and from where the victim was lying to Court Street and to Cleveland Street. Based on those measurements, Sergeant Logan estimated that the victim landed about forty-two feet from where the vehicle hit him. Sergeant Logan's diagram was admitted into evidence.

On cross-examination, Sergeant Logan agreed that the diagram was based solely on witness accounts and that there were no skid marks or debris at the scene. Sergeant Logan did not investigate the accident any further after that night. On redirect examination, Sergeant Logan stated that the vehicle "had a little speed" because the victim had been "knocked . . . out of his shoe." He further explained that a vehicle traveling thirty-five miles per hour could kill a pedestrian upon contact.

Lisa Anderson, the victim's sister, received a call that the victim had been injured and had been taken to the Regional One Medical Center. She identified photographs of the victim in the hospital showing that the victim's head was severely swollen and that his scalp had been stapled. Ms. Anderson stated that the victim was later transferred from Regional One Medical Center to a nursing home in Savannah, Tennessee. The victim's condition did not change or improve while he was in the nursing home. The victim eventually became sick and was transported to Baptist Memorial Hospital East where he died.

Dr. John Fowler testified as an expert in internal medicine. Dr. Fowler recognized his electronic signature as the certifying physician on the victim's death certificate; the death certificate indicating that the victim died August 1, 2018 was entered into evidence. Dr. Fowler explained that he identified multiple medical conditions that he attributed to the victim's death but that the victim's "immediate cause [of death] was sepsis." Dr. Fowler explained that sepsis is a bloodstream infection and, in this case, it was caused by respiratory failure. The victim's respiratory failure was caused by encephalopathy, which is a "brain malfunction[,]" and the encephalopathy was caused by his "traumatic brain injury."

The State read the following stipulation into the record: "[The victim] arrived at Parkrest Nursing Home in Savannah[,] TN on [M]ay 8, 2018 and passed away 7/31/2018 at Baptist East. Upon arrival at Parkrest, [the victim] had a Status post left frontotemporal parietal craniectomy and cranial defect that never showed improvement during his entire stay at Parkrest." The State then rested its case, and the trial court denied Defendant's motion for judgment of acquittal.

Defendant testified that he knew "[n]othing" about this case because he "wasn't there." On cross-examination, Defendant stated that Ms. Street and Ms. Branklin had lied during their testimonies. Defendant agreed that the blue van in question was his vehicle and that he knew Ms. Street and Ms. Branklin, but he maintained that he had not been driving the van that night. Defendant stated that the windshield of his van had been cracked prior to the night of this offense.

- 5 -

Defendant was indicted by a Shelby County Grand Jury for first degree murder, count one, and reckless endangerment using a deadly weapon, count two. The State dismissed count two prior to trial. Based on the above evidence, the jury convicted Defendant of the lesser-included offense of second degree murder. After a sentencing hearing, the trial court imposed a twenty-five-year sentence to be served at 100%. Defendant filed a timely motion for new trial, which was denied. Defendant's timely appeal is now before this court.

## Analysis

Defendant argues that there was insufficient evidence to support his conviction because the State did not prove his identity as the perpetrator or that he possessed the requisite mental state for second degree murder. The State argues that the evidence sufficiently supported Defendant's conviction. We agree with the State.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

Second degree murder is a "knowing killing of another." T.C.A. § 39-13-210(a)(1). Second degree murder is a "result of conduct offense." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). A person acts "knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[,]" even if the result is not his desire. T.C.A. § 39-11-302(b); *State v. Kelly*, 34 S.W.3d 471, 478 (Tenn. Crim. App. 2000). Whether a defendant acted "knowingly" is a question for the jury and "may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). The identity of the perpetrator is an essential element of any crime and may be established based solely upon circumstantial evidence. *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021).

First, Defendant asserts that Ms. Branklin's testimony was unreliable and insufficient to establish that he was the driver of the van that struck the victim because she was "a recovering drug addict on her way to get beer," and Ms. Street's testimony conflicted with Ms. Branklin's testimony more than it corroborated it. However, "the weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony, if any, are matters entrusted exclusively to the jury. . . . It is not the function of this [c]ourt to reweigh the credibility of the witnesses on appeal." *State v. Clark*, No. W2015-01579-CCA-R3-CD, 2016 WL 4350222, at *7 (Tenn. Crim. App. Aug. 15, 2016). We note that Ms. Street's testimony does not conflict with Ms. Branklin's testimony in any material way. In fact, their testimonies work together to present a narrative of events starting with the initial altercation with the unknown man at the Yellow Store, continuing to Defendant hitting the victim with his van and leaving the scene, returning to the scene with Ms. Street driving the van before leaving again, and ending with Defendant's being detained at his apartment and taken for questioning.

Defendant, relying on *State v. Wilkins*, next asserts that the "jury would have to make inferences" to conclude that he was the driver of the van when it struck the victim. No. W1999-01462-CCA-MR3-CD, 2000 WL 1229156, at *7 (Tenn. Crim. App. Aug. 18, 2000). In *Wilkins*, the victim had been kidnapped by the Gangster Disciples, taken to an apartment, assaulted, and then transported to a park where he was killed. *Id.* at *2-4. There was no dispute that "Big Folk" had murdered the victim, but there was dispute regarding the identity of "Big Folk." *Id.* Three gang members testified. *Id.* at *1. The first witness saw the events at the apartment and had not previously known "Big Folk," but positively identified the defendant as "Big Folk." *Id.* at *2. The second witness also witnessed only the events at the apartment, but knew "Big Folk" prior to the events and stated that the defendant was not "Big Folk." *Id.* at *3. The third witness, who had seen the events at the apartment and at the park, testified that the defendant was not "Big Folk." *Id.* at *4. The

trial court found that "the identity issue was a credibility issue for the determination of the jury and that the jury accredited the testimony of [the first witness] that the [d]efendant was 'Big Folk.'" *Id.* at \*7. This court reversed finding that the evidence was insufficient because the sole witness who identified the defendant as "Big Folk" did not witness the killing. *Id.*

We find Defendant's reliance on *Wilkins* misplaced. First, the perpetrator in *Wilkins* was identified only as "Big Folk," and only a witness unfamiliar with the defendant prior to the offense knew the defendant as "Big Folk" and that witness did not observe the killing of the victim. In this case, Ms. Street and Ms. Branklin both knew Defendant prior to the offense and both identified him by his first and last name. Further, the jury did not have to "infer" Defendant's identity because Ms. Branklin witnessed Defendant hit the victim with his van. Ms. Branklin testified that Defendant almost struck her with his van, reversed the van off the sidewalk, continued down the street a short distance, and then struck the victim. Other than Defendant's testimony that he was not the driver of the van that hit the victim, there was no evidence that anyone other than Defendant was the driver. Ms. Street testified that when Defendant returned to pick her up from the Yellow Store, he told her that he "got" the man that tased her, and he later explained to her that the windshield was cracked because he "got" the man. Although Defendant testified that he was not driving the van when it struck the victim and that Ms. Street and Ms. Branklin lied during their testimony, the jury was free to discredit his testimony. *See State v. Bargery*, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at \*75 (Tenn. Crim. App. Oct. 6, 2017) (noting that the jury was free to discredit the defendant's testimony that conflicted with two other witnesses' testimonies). In returning a verdict of guilt, the jury chose to credit the State's theory that Defendant was driving the van when it struck the victim. *See Bland*, 958 S.W.2d at 659. There was sufficient evidence for the jury to conclude that Defendant was the driver of the van that struck the victim.

Finally, Defendant asserts that the State did not prove that he knew his conduct was reasonably certain to cause the victim's death. *See* T.C.A. § 39-11-302(b). When viewed in the light most favorable to the State, the evidence showed that an unknown man tased Ms. Street and then ran away from the Yellow Store. Defendant pursued the man on foot, but when he could not catch the man, Defendant decided to pursue the man in his van. Ms. Street testified that Defendant was "mad" when he drove away in his van. Defendant almost struck Ms. Branklin with his van and then did strike the victim at a speed in excess of thirty-five miles per hour causing the victim to travel through the air about forty-two feet before striking a cement pole. Defendant then returned to Ms. Street and told her that he "got" the person that tased her. The victim died from the injuries he sustained from being struck by Defendant.

The jury could reasonably conclude beyond a reasonable doubt that purposefully striking a pedestrian with a vehicle at any speed, especially a large vehicle like Defendant's van, at a speed sufficient to throw the pedestrian over forty feet, is reasonably certain to result in the death of the pedestrian. *See State v. Moore*, No. W2016-00094-CCA-R3-CD, 2017 WL 2820105, at *5 (Tenn. Crim. App. June 29, 2017) (noting that "[j]uries are able to use their collective knowledge, experience, and common sense when reaching factual determinations"); *State v. Davis*, 466 S.W.3d 49, 69 (Tenn. 2015) (noting that whether a defendant "acted knowingly in killing another is a question of fact for the jury"). Defendant notes that Ms. Street testified that Defendant was "mad," but Defendant did not express a desire to kill anyone. However, his desire for the result of his conduct is irrelevant to whether he was reasonably certain that the result would occur. *See Kelly*, 34 S.W.3d at 478. Further, it is irrelevant that the victim was not Defendant's intended target. *See Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999) (holding that a defendant that kills an unintended victim may still be guilty of first degree murder); *State v. Parham*, No. W2009-00709-CCA-R3-CD, 2010 WL 2898785, at *11 (Tenn. Crim. App. July 26, 2010) (noting that this court has extended the supreme court's holding in *Millen* to second degree murder when a defendant kills an unintended person). It was reasonable for the jury to conclude that Defendant knew his actions were reasonably certain to kill the victim based on the nature, character, and circumstances of the case. *See Inlow*, 52 S.W.3d at 105.

The evidence was sufficient to support Defendant's conviction for second degree murder. Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JILL BARTEE AYERS, JUDGE

- 9 -