FILED

06/28/2024

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON
## May 1, 2024 Session

## STATE OF TENNESSEE v. AMBREIA TAVARIS WASHINGTON

**Appeal from the Circuit Court for Madison County**
**No. 22-188    Joseph T. Howell, Judge**

_____

### No. W2023-00691-CCA-R3-CD
_____

Defendant, Ambreia Tavaris Washington, was convicted in a bifurcated trial by a Madison County jury of attempted first degree murder where the victim suffered serious bodily injury (count one), unlawful employment of a firearm during the attempt to commit a dangerous felony (count two), three counts of unlawful possession of a firearm after having been convicted of a felony crime of violence (counts three, four, and five), unlawful possession of a firearm after having been convicted of a felony drug offense (count six), and two counts of unlawfully employing a firearm during the commission of or attempt to commit a dangerous felony after having been previously convicted of a dangerous felony (counts seven and eight). Following a sentencing hearing, the trial court imposed an effective sixty-three-year sentence. On appeal, Defendant argues that because there was insufficient evidence of serious bodily injury, his conviction in count one should be reduced to attempted first degree murder without the serious bodily injury sentencing enhancement, and that the trial court erred in imposing discretionary consecutive sentencing. Following review of the entire record, oral arguments, briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Brennan M. Wingerter, Assistant Public Defender – Appellate Director (on appeal), and Parker O. Dixon, Assistant Public Defender (at trial), for the appellant, Ambreia Tavaris Washington.

Jonathan Skrmetti, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General, Joshua Daniel Minchin, Office of the Solicitor General Honors Fellow; Jody Pickens, District Attorney General; and Bradley F. Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

*Trial*

On June 10, 2021, Ryan Murphy, the victim, left work around 7 p.m. and decided to take dinner to his friend, Shaquacia Rodgers. The victim explained that he and Ms. Rodgers had been romantically involved in the past, but they were just friends at that time. The victim went to Popeye's then to Ms. Rodgers's apartment complex where he parked in a visitor parking spot. The victim exited his vehicle and began to walk toward the apartment with the food in hand when Defendant approached him and asked who he was there to visit. He and Defendant were standing about "five to ten feet from each other" at that point. When the victim told Defendant he was there to visit Ms. Rodgers, Defendant shot him in the stomach. The victim had not previously noticed that Defendant had a firearm and stated that he did not carry a weapon while he worked and denied being armed that night. After he was shot, the victim ran from Defendant and hid behind a dumpster for "about [twenty] or [thirty] seconds" then ran toward the front of the apartment complex where he met Ms. Rodgers and her friend. The victim was bleeding from the gunshot wound "but it wasn't a whole lot of bleeding" so he thought he might have been "grazed" by the bullet. At the time of the shooting, the victim did not know Defendant, but he identified Defendant in court as the man who shot him.

A nurse who lived at the apartment complex rendered aid to the victim until police and emergency medical personnel arrived. The victim was transported by ambulance to the hospital where he underwent a three-hour surgery during which doctors removed the bullet and approximately two inches of his intestine. The victim testified that when he realized the nature of his injuries, he was afraid he was going to die and was in fear for his life after "they told me how serious it was." When the victim awoke the day after his surgery, he spoke to Jackson Police Department ("JPD") Investigator Jay Stanfill, gave a written statement, and identified Defendant in a photographic lineup, which was admitted into evidence. In September 2021, the victim underwent a second surgery to remove scar tissue that had "wrapped around" his intestine.

On cross-examination, the victim stated that he learned after the shooting that Defendant had threatened to harm him via text message to Ms. Rodgers, and he was "shock[ed]" to learn that Ms. Rodgers had not notified him of the threat. The victim reiterated that he had texted Ms. Rodgers to meet him outside and had begun walking toward her apartment when Defendant approached him. The victim explained that Defendant was initially about five feet away from him and then took a step back and shot him. The victim admitted that he had previous felony convictions but denied that he

possessed a firearm on the night of the offenses and denied that he disposed of a firearm in the apartment complex dumpster after being shot.

On recross-examination, the victim stated that he was not under the effects of medication when he gave the statement to Investigator Stanfill; he had rejected pain medication when he awoke from surgery.

Ms. Rodgers testified that she knew Defendant through his daughter. While she had previously been romantically involved with Defendant, she had not been romantically involved with him for at least a year prior to the shooting. Ms. Rodgers stated that Defendant had been at the apartment complex earlier in the day sitting on the tailgate of his tan Ford F-150. Ms. Rodgers was friends with the victim and stated that she had no intent to "pit" the men against each other.

At 8:46 p.m. on the night of the shooting, Defendant texted Ms. Rodgers asking her to come outside to the parking lot. Ms. Rodgers responded that she was about to have a visitor. Defendant threatened to "whoop" any man that visited Ms. Rodgers. When the victim arrived, Defendant texted Ms. Rodgers, "Yo boy bout to get shot." As Ms. Rodgers walked outside of her friend's apartment to meet the victim, she saw Defendant standing at the top of a set of stairs and the victim at the bottom of the stairs; she did not see a weapon at that time. Defendant said, "you thought I was playing" and then shot what Ms. Rodgers described as a "cowboy gun" with a cylinder once, hitting the victim in the stomach. Ms. Rodgers identified Defendant in court as the man who shot the victim. Ms. Rodgers ran toward the front of the apartment complex with the victim, and Defendant "sped off." Ms. Rodgers noticed blood on the victim's shirt.

Ms. Rodgers observed at the time of the shooting, the victim and Defendant were about five or six feet apart, with Defendant standing at the top of a set of stairs. Contrary to the victim's testimony, Ms. Rodgers said the victim ran to the front of the apartment complex with her, not to the dumpster. She and her friend and their children were all outside and ran that direction. Ms. Rodgers stated that her memory was good even though she had consumed one "alcoholic beverage cooler" earlier in the day while she sat on the tailgate of Defendant's truck with Defendant and her aunt. Ms. Rodgers went inside around 8:00 or 9:00 p.m. but came back outside when the victim texted her. During the shooting, her attention was focused on her children, who were outside, rather than the victim. Ms. Rodgers agreed that she did not warn the victim because she did not think Defendant was serious.

JPD officer Joshua Michael responded to the scene of the shooting. Footage from Officer Michael's body-worn camera showing the scene after the shooting was admitted into evidence. In a portion of the footage, the victim can be seen wearing a white, blood-

stained shirt and smoking a cigarette.  Before the victim was loaded into the ambulance, emergency medical personnel checked for, but did not find, an exit wound.

Officer Michaels recalled that Ms. Rodgers informed him that she was outside with her children when Defendant shot the victim with a "cowboy gun," which Officer Michaels determined was a revolver, before Defendant drove away in his tan Ford F-150.  Ms. Rodgers showed Officer Michaels the approximate location of the shooting and where Defendant's truck had been parked.  Ms. Rodgers also explained that she and Defendant "use to talk[,]" but were no longer romantically involved.  She read text messages Defendant had sent her earlier in the night threatening to "whoop" any man that visited her that night.  Ms. Rodgers did not know Defendant's name but showed the officers Defendant's Facebook profile.  On cross-examination, Officer Michaels agreed that he did not search the dumpster at the apartment complex for a weapon.

JPD Major Crimes Investigator Jay Stanfill, the lead investigator in this case, testified that he identified Defendant as a suspect based on information reported at the scene.  Investigator Stanfill identified a video of the parking lot of the apartment complex recorded the night of the shooting.  The footage was admitted into evidence and showed the entrance to the apartment complex but did not capture the shooting.  The video showed that shortly before 9:21 p.m., the victim, Ms. Rodgers, Ms. Rodgers's friend, and their children ran across the parking lot from the area where the shooting occurred toward a building in the front of the apartment complex.  A few seconds later, a gold or tan Ford F-150 came from the area where the shooting occurred and exited the apartment complex.

Investigator Stanfill collected Defendant's phone and the Tennessee Bureau of Investigation performed a forensic extraction.  Investigator Stanfill read text messages between Defendant and Ms. Rodgers from the night of the shooting into the record.  At 8:49 p.m., Ms. Rodgers informed Defendant that she was about to have company, to which Defendant replied, "Go ahead[,]" followed by "See how that turn out[.]"  After some additional text messages, at 8:57 p.m., Defendant texted Ms. Rodgers: "If a n**** come here tonight I'm whooping him[.]"  At 8:59 p.m., Defendant again text messaged Ms. Rodgers: "I'm still whooping any n**** come threw [sic] tonight.  Its on you[.]"  Ms. Rodgers told Defendant that she did not "belong" to him, to which Defendant replied, "Say what you want let a n**** pull up and you'll see what I'm on[.]"  Defendant's final text message to Ms. Rodgers at 9:21 p.m. stated "Yo boy about to get shot[.]"

On cross-examination, Investigator Stanfill acknowledged that he first became involved in the investigation the morning after the shooting and did not go to the scene.  Investigator Stanfill did not collect a bullet from the victim because the hospital did not notify him that there was a bullet to be collected.  Investigator Stanfill was unaware of the caliber of firearm used to shoot the victim.  On redirect examination, Investigator Stanfill

clarified that he knew that the victim had been shot based on witness accounts and his interview with the victim in the hospital; the victim's injury appeared consistent with having been shot.

Following the above proof, the State rested its case regarding counts one and two, and the trial court denied Defendant's motion for judgment of acquittal. Defendant did not present proof. Based on this evidence, the jury convicted Defendant as charged in count one for attempted first degree murder and that the victim suffered serious bodily injury and in count two for unlawful employment of a firearm during the commission or attempt to commit a dangerous felony.

The court then proceeded with a bifurcated trial regarding the firearm charges brought against Defendant: unlawful possession of a firearm after having been convicted of a felony crime of violence (counts three, four, and five), unlawful possession of a firearm after having been convicted of a felony drug offense (count six), and unlawfully employing a firearm during the commission of or attempt to commit a dangerous felony after having been previously convicted of a dangerous felony (counts seven and eight). The State introduced certified copies of Defendant's prior Madison County convictions for aggravated assault as it related to count three, aggravated burglary as it related to counts four and seven, attempted aggravated kidnapping as it related to count five, and possession of a Schedule II controlled substance with intent as it related to counts six and eight. No other proof was introduced, and the jury convicted Defendant as charged.

*Sentencing*

On December 5, 2022, the trial court conducted Defendant's sentencing hearing. The State introduced Defendant's presentence report, which reflected that Defendant had twenty-nine prior convictions that spanned from 1998 until 2021, and included multiple violent misdemeanor offenses, and weapons and drug offenses. Defendant's presentence report also reported a confirmed gang affiliation but stated that Tennessee Department of Correction records confirmed that Defendant completed a "gang program" while incarcerated to end his affiliation with the gang. Defendant reported that he dropped out of school after the ninth grade and did not complete a GED program. Defendant was an "admitted alcoholic" and reported prior marijuana use but denied use of any "hard drugs." Defendant reported attending multiple mental health treatment programs, but he could not report specific diagnoses; bipolar disorder and schizophrenia were "possible" diagnoses.

Prior to hearing argument, the trial court confirmed with the parties that Defendant was a Range II offender for counts one, three, four, and five, and a Range III offender for the remaining counts. The State clarified that because of the serious bodily injury enhancement, count one had an eighty-five percent release eligibility date. The trial court

noted that as a matter of law, count two was required to be served consecutively to count one, and because Defendant was serving a probated sentence at the time of the current offenses, all sentences in this case were required to be served consecutively to that case. The court would consider the alignment of counts three through six.

The State argued for sentences at the top of the range for each of Defendant's convictions based on application of several enhancement factors. The State noted that at the time of the offenses, Defendant was on bail in an unrelated case charging him with the unlawful possession of a firearm after having been convicted of a felony charge. Defendant was also on probation for driving with a suspended license. The State further asked the trial court to align Defendant's sentences in counts three through six consecutively to the other counts because Defendant was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood, had an extensive record of criminal activity, and was on bail when he committed the instant offenses.

Defendant argued for the minimum sentence for each conviction and for the trial court to exercise its discretion to align counts three through six concurrently with the other counts. Defendant noted that he did not have a high school education and struggled with psychological and alcohol problems. He asserted that he was inebriated when the shooting occurred.

The trial court applied four enhancement factors: (1) Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; (8) Defendant failed to comply with the conditions of a sentence involving release into the community; (10) Defendant had no hesitation about committing a crime when the risk to human life was high; and (13) Defendant was on bail and probation at the time the offenses were committed. *See* T.C.A. § 40-35-114(1), (8), (10), (13). The trial court did not find any applicable mitigating factors. Regarding the alignment of counts three through six, the trial court found that Defendant was a professional criminal who has knowingly devoted his life to criminal conduct and criminal acts as a source of livelihood. *See id.* at § 40-35-115(b)(1). It considered Defendant's criminal history and specifically noted that Defendant's fifteen prior misdemeanors included "assaults, evading arrest, domestic assault, escape[,] and vandalism." *See id.* at § 40-35-115(b)(2). The trial court also considered that Defendant was on probation and bail at the time of the offenses. *See id.* at § 40-35-115(b)(6).

The trial court sentenced Defendant to thirty-five years for count one, fifteen years for counts three, four, five, and six, which were merged, and thirteen years for counts two, seven, and eight, which were merged. The trial court ordered all sentences to be served consecutively, for an effective sixty-three-year sentence.

Defendant filed an untimely motion for new trial on January 10, 2023, approximately two days past the time limit. The timeliness of the motion for new trial was not raised and after a hearing on May 30, 2023, the trial court denied the motion for new trial. Defendant's notice of appeal was filed on May 10, 2023. However, because Defendant's motion for new trial was untimely, so too was the notice of appeal. In his brief, Defendant acknowledges that the late-filed motion for new trial results in waiver of appellate review of any issues that could have been raised in the motion for new trial, except sufficiency of the evidence and sentencing. The State noted the untimeliness of the notice of appeal in its brief, which Defendant addressed in his reply brief and at oral argument. Following oral argument, Defendant filed a Motion for Leave of Court to Accept Late-Filed Notice of Appeal and to Waive Timely Filing. Defendant's appeal from his convictions and the motion to waive timely filing are now before this court.

**Analysis**

### I. Untimely Notice of Appeal

Initially, we must address Defendant's pending motion to waive timely filing. Because a timely notice of appeal is not jurisdictional, this court may waive this requirement in the interest of justice after considering "the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case." *State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007) (quoting *State v. Broyld*, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415 (Tenn. Crim. App. Dec. 27, 2005)); *see* Tenn. R. App. P. 4(a). Both parties have fully briefed and argued the merits of Defendant's appeal. Defendant was convicted of attempted first degree murder and sentenced to sixty-three years. Accordingly, we conclude that it is in the interest of justice to waive the timely filing of Defendant's notice of appeal and address the merits of the issues raised on appeal.

### II. Sufficiency of the Evidence

Defendant asserts that because the State failed to prove that the victim suffered serious bodily injury, this court should reduce his conviction in count one to attempted first degree murder without serious bodily injury, thus lowering his release eligibility to thirty-five percent. *See* T.C.A. § 40-35-501(a)(7)(d) (stating that Range II offenders are eligible for release after service of thirty-five percent of their sentence); T.C.A. § 40-35-501(k)(1)(5) (2021) (stating that an offender convicted of attempted first degree murder where the victim suffered serious bodily injury must serve eighty-five percent of their sentence). Defendant does not contend that the evidence was in any other way insufficient to support his conviction for attempted first degree murder and does not challenge his convictions for counts two through eight. The State argues that there was sufficient

evidence for the jury to reasonably find that the victim suffered serious bodily injury. We agree with the State that the evidence is sufficient to support the jury's verdict.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

First degree murder is the "premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). A person commits criminal attempt who, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" *Id.* at § 39-12-101(a)(2). Further:

> [t]here shall be no release eligibility for a person committing attempted first degree murder as defined in § 39-13-202 where the victim suffers serious bodily injury as defined in § 39-11-106, on or after July 1, 2013, until the person has served eighty-five percent (85%) of the sentence imposed by the court less sentence credits earned and retained.

T.C.A. § 40-35-501(k)(5) (2021); *see State v. Brakefield*, No. W2023-00766-CCA-R3-CD, 2024 WL 1739263, at \*4 (Tenn. Crim. App. Apr. 23, 2024) (noting that serious bodily injury is an enhancement factor and must be presented to the jury), *no perm. app. yet filed*.[1] Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" T.C.A. § 39-11-106(a)(3). Serious bodily injury is bodily injury that involves:

(A)     A substantial risk of death;

(B)     Protracted unconsciousness;

(C)     Extreme physical pain;

(D)     Protracted or obvious disfigurement;

(E)     Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]

*Id.* at § 39-11-106(a)(37)(A)-(E). "The distinction between '**bodily injury**' and '**serious bodily injury**' is generally a question of fact for the jury and not one of law." *State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997) (emphasis in original).

Defendant argues that the victim's injury does not meet the statutory definition of serious bodily injury as defined in the statute, and specifically focuses on whether the victim's injury involved "a substantial risk of death," "protracted or obvious disfigurement," or "protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty." *See id.* at § 39-11-106(a)(37)(A), (D), and (E).

First, we note that a gunshot wound is not necessarily a serious bodily injury. *See State v. Farmer*, 380 S.W.3d 96, 102 (Tenn. 2012) (finding no serious bodily injury when gunshot passed through the victim's leg). Regarding whether an injury involves a substantial risk of death, "we must look to the injury that occurred rather than the injury that could have occurred or the manner in which it occurred." *See id.* In cases that involve "injuries that are either so serious or so trivial that a lay person will understand that they either do or do not involve a substantial risk of death," there is no need to present expert medical testimony. *Id.* at 104 (Koch, J., concurring) (advising to "[c]ompare a massive gunshot wound to the heart with a bullet superficially grazing a person's elbow.").

---

[1] For all attempted first degree murder convictions committed on or after July 1, 2022, there is no longer any release eligibility. T.C.A. § 40-35-501(bb)(1), (bb)(2)(a).

Defendant asserts that in this case the victim's injury falls between the two examples provided by Justice Koch in his concurring opinion in *Farmer*, and thus the victim's testimony was "not sufficient to prove the State's case" without expert medical testimony or the victim's medical records. While expert medical testimony or medical records would have provided support for victim's testimony, in this case, the victim's testimony was sufficient to establish that the victim suffered the "protracted loss or substantial impairment of a bodily member, organ or mental faculty." When viewed in the light most favorable to the State, the evidence showed that in his first surgery, the victim lost approximately two inches of his intestine. Later, a second surgery was required to remove scar tissue that had developed on his intestine from the removal of the bullet and the first surgery. A reasonable jury could have found beyond a reasonable doubt that the surgical removal of two inches of intestine and subsequent surgery requiring removal of scar tissue from the intestine involved protracted loss or substantial impairment of the victim's intestine. *See State v. Moore*, No. W2016-00094-CCA-R3-CD, 2017 WL 2820105, at *5 (Tenn. Crim. App. June 29, 2017) (noting that "[j]uries are able to use their collective knowledge, experience, and common sense when reaching factual determinations").

Although we "need only consider one of the factors for our review[,]" for completeness, we will address the remaining two definitions of serious bodily injury. *State v. Darvin*, No. M2018-01669-CCA-R3-CD, 2019 WL 4440220, at *4 (Tenn. Crim. App. Sept. 17, 2019). Defendant asserts that there was not protracted or obvious disfigurement because the victim "did not show the jury any surgery scars or pictures of his abdomen either before or after his surgery" and did not testify that the removal of two inches of his intestine "caused any health problems, discomfort, or disfigurement[.]" The State asserts that the victim's loss of two inches of his intestine constituted protracted and obvious disfigurement because it was a "permanent and easily understood impairment." The State further argues that the victim's second surgery for the removal of scar tissue also meets the statutory definition of serious bodily injury. "'Protracted' means 'delayed or prolonged in time.'" *State v. McDonald*, No. W2020-00127-CCA-R3-CD, 2021 WL 1654477, at *8 (Tenn. Crim. App. Apr. 28, 2021) (citing *State v. Carroll*, No. E2013-01781-CCA-R3-CD, 2014 WL 1759101, at *5 (Tenn. Crim. App. Apr. 30, 2014)). This court has consistently held that a scar is sufficient to establish serious bodily injury. *State v. George*, No. W2023-00124-CCA-R3-CD, 2023 WL 6629731, at *4 (Tenn. Crim. App. Oct. 12, 2023) (listing cases in which this court has found that a scar established "protracted and obvious disfigurement"), *no perm. app. filed*. Further, a disfigurement need not be visible to the naked eye. *State v. Prescott*, No. W2012-02454-CCA-R3CD, 2014 WL 1464179, at *7 (Tenn. Crim. App. Apr. 11, 2014) (noting that "the definition is 'protracted' *or* 'obvious' disfigurement"). As Defendant notes, the victim did not state whether he had a scar on his abdomen from either where the bullet entered or from his surgeries. However, the victim did testify about his additional surgery months after the shooting to remove scar tissue that

- 10 -

had formed around his intestine. The jury could have reasonably found that the victim suffered protracted disfigurement due to the formation of scar tissue around his intestine resulting from his being shot and the removal of a portion of his intestine.

Finally, Defendant contends that nothing in the record established that the victim's injury involved a substantial risk of death. As Defendant notes, the victim initially thought he had been grazed by the bullet because there was little bleeding and he was seen on body camera upright and smoking a cigarette after having been shot. However, the victim testified that once he was advised about the seriousness and extent of his injuries, he was afraid he might die. The proof showed that the victim underwent a three-hour surgery to remove the bullet, and the removal of the bullet resulted in the removal of approximately two inches of his intestine. *See State v. Turley*, No. W2022-01810-CCA-R3-CD, 2024 WL 1173063, at *11 (Tenn. Crim. App. Mar. 19, 2024) (affirming conviction for attempted first degree murder with serious bodily injury when the victim was shot in the stomach), *no perm. app. filed*. Admittedly, without the victim's medical records or expert medical testimony regarding the impact of the removal of a portion of the victim's intestine, the State's argument that the victim's injury involved a substantial risk of death is not as strong. Defendant notes that this court has held that "[n]either a broken nose nor surgery to repair that break inherently, without more, involve a substantial risk of death." *State v. Martin*, No. W2017-01610-CCA-R3-CD, 2018 WL 4677575, at *11 (Tenn. Crim. App. Sept. 28, 2018). However, the surgery in this case, unlike in *Martin*, involved abdominal surgery to remove a bullet and removal of a portion of the victim's intestine. This evidence was sufficiently "more" than presented in *Martin*. *See id.* A reasonable jury could have found, based on the victim's testimony, that the victim's injury involved a substantial risk of death.

Under any of the above theories, the evidence was sufficient to establish that the victim suffered serious bodily injury. Defendant is not entitled to relief.

### III.    Consecutive Sentencing

Defendant asserts that the trial court erred by ordering his fifteen-year sentence for counts three through six to be served consecutively without first finding that the "effective life sentence" was the least severe measure necessary to achieve the purposes and principles of sentencing. The State argues that the trial court properly exercised its discretion. We agree with the State.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). "[W]hen a trial court places findings on the record to support its sentencing decision, the applicable standard of appellate review for a challenge to the imposition of consecutive sentences is abuse of discretion with a presumption of reasonableness." *State v. Pollard*,

432 S.W.3d 851, 859-62 (Tenn. 2013); *see State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)).

"If the defendant . . . is convicted in one trial of more than one offense, the trial judge shall determine whether the sentences will be served concurrently or consecutively." Tenn. R. Crim. P. 32(c)(1). This court gives deference "to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b):"

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive; [or]
>
> . . .
>
> (6) The defendant is sentenced for an offense committed while on probation[.]

*Pollard*, 432 S.W.3d at 861-862; T.C.A. § 40-35-115(b). Additionally, "the imposition of consecutive sentencing is subject to the general sentencing principle that the overall sentence imposed 'should be no greater than that deserved for the offense committed' and that it 'should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]'" *State v. Biggs*, 482 S.W.3d 923, 926 (Tenn. Crim. App. 2015) (quoting T.C.A. § 40-35-103(2), (4)). While the trial court is required to place its findings in the record, there is no requirement that the reasoning be "particularly lengthy or detailed." *State v. Perry*, 656 S.W.3d 116, 126 (Tenn. 2022) (quoting *Bise*, 380 S.W.3d at 706).

Defendant acknowledges that the trial court was mandated to impose consecutive sentences for all counts except counts three through six. *See* T.C.A. § 39-17-1324 (possession of firearm sentence must be consecutive to the underlying dangerous felony); T.C.A. § 40-20-111(b) (mandating consecutive sentencing for a felony committed while on bail when the defendant is convicted of both offenses); Tenn. R. Crim. P. 32(c)(3)(C) (same). Defendant further concedes that the trial court properly found that consecutive sentencing may be imposed for counts three through six under Tennessee Code Annotated

section 40-35-115(b). However, Defendant contends that the effective sixty-three-year sentence was not the least severe measure necessary to achieve the purposes for which the sentence was imposed. *See* T.C.A. § 40-35-103(4).

Although not explicitly stated, the record is sufficient to infer that the trial court found that the sixty-three-year sentence was the least severe measure necessary. *State v. Mahaffey*, No. W2022-01778-CCA-R3-CD, 2024 WL 418130 (Tenn. Crim. App. Feb. 5, 2024) (concluding that the record is sufficient to infer consideration of whether the sentence was justly deserved in relation to seriousness of the offense and the least severe measure necessary) (citing *State v. Henderson*, No. W2022-00882-CCA-R3-CD, 2023 WL 4105937, at *7 (Tenn. Crim. App. June 21, 2023)), *no perm. app. filed*. The trial court considered Defendant's criminal history documented in the presentence report, which spanned over twenty years. The trial court specifically noted fifteen prior misdemeanors that were "not shoplifting charges [and] not joyriding charges[,]" but were instead crimes against persons. The trial court also noted that Defendant was on probation and bail in two unrelated cases when Defendant committed these offenses. Further, the trial court considered all the facts and testimony presented at trial. The trial court did not abuse its discretion by imposing consecutive sentences for counts three through six. Defendant is not entitled to relief.

Finally, Defendant asserts that the trial court failed to state on the record the estimated number of years and months that Defendant would be required to serve before he is eligible for release on parole as required by Tennessee Code Annotated section 40-35-210(e)(1)(C). However, the "estimation provided pursuant to subdivision (e)(1)(C) is not a basis for post-conviction relief or for a direct appeal of the defendant's sentence." *Id.* at § 40-35-210(e)(3). Defendant is not entitled to relief.

### Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JILL BARTEE AYERS, JUDGE