IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 6, 2025

## STATE OF TENNESSEE v. LOVE T. ANDERSON

**Appeal from the Circuit Court for Lauderdale County**
**No. 11333    A. Blake Neill, Judge**

———————————————————————

### No. W2024-00470-CCA-R3-CD

———————————————————————

Defendant, Love T. Anderson, was convicted by a Lauderdale County jury of one count of aggravated child abuse, one count of aggravated child neglect, and two counts of aggravated child endangerment. The trial court imposed an effective fifteen-year sentence. On appeal, Defendant asserts that the evidence was insufficient to support his convictions. Upon review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and STEVEN W. SWORD, JJ., joined.

Bryan R. Huffman, Covington, Tennessee, for the appellant, Love T. Anderson.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Mark Davidson, District Attorney General; and Julie Pillow and Harrison Hight, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

On June 6, 2022, Defendant and Co-defendant Rebecca M. Davis were indicted for aggravated child abuse (count one), aggravated child endangerment (counts two and four), and aggravated child neglect (count three) for injuries to D.A.,[1] their two-month-old son.

---

[1] Because it is the policy of this court to protect the identity of minor victims, we will identify D.A. by his initials.

At trial,[2] Dr. Michael Abdelmisseh testified that he was D.A.'s pediatrician from the time of D.A.'s birth in February 2022. Dr. Abdelmisseh explained that he usually sees newborns before they leave the hospital, followed by a visit "three to four days after leaving the hospital," and then visits at one-week-old, two-weeks-old, one-month-old, and two-months-old. Each time he saw D.A., Dr. Abdelmisseh conducted head-to-toe examinations. He last saw D.A. on March 24, 2022. D.A. initially struggled to gain weight but by the March 24 visit, he had begun gaining weight appropriately. Dr. Abdelmisseh recalled that there was a "negative energy" between Defendant and Co-defendant Davis during the visits.

On cross-examination, Dr. Abdelmisseh confirmed that he did not notice any injuries to D.A. at any of his appointments. He also agreed that he was legally required to report any concerns of abuse.

Diane Brown, Defendant's paternal grandmother and D.A.'s paternal great-grandmother, testified that on April 6, 2022, Defendant called her to care for D.A. while Defendant worked. Ms. Brown agreed and drove from her home in Brownsville to meet Defendant at a store in Ripley, where Defendant lived, to get D.A. D.A. was asleep and remained asleep in his car seat for "about an hour." When D.A. woke up, he cried when he was moved and "[j]ust kept crying and crying." Ms. Brown found this unusual because D.A. was usually "quiet" and would "lay there and sleep." She called her daughter, Defendant's mother Latonjo Booker, to discuss whether D.A. needed to go to the doctor. Ms. Brown denied that anything happened that could cause D.A. to be injured while he was in her care.

On cross-examination, Ms. Brown clarified that D.A. slept for the thirty-minute drive to her home and then an additional hour. D.A. became "fussy" when she woke him, and she tried to console him for approximately an hour before calling Ms. Booker. Ms. Brown called Ms. Booker because D.A. "had never cried before like that. I thought maybe he had the colic and needed to go to the doctor[.]" Ms. Brown drove D.A. to Ms. Booker's home and Ms. Booker made the decision to take D.A. to West Tennessee Healthcare Dyersburg Hospital ("Dyersburg Hospital"). Ms. Brown spoke to the police a few days after April 6, but did not speak to the Department of Children's Services ("DCS").

Ms. Booker, Defendant's mother and D.A.'s paternal grandmother, identified Defendant and Co-defendant Davis in court. Ms. Booker cared for D.A. "[a] lot" beginning when D.A. was approximately two weeks old. She explained that it was "a habit" to take "before and after" pictures when she cared for D.A. She identified photographs of D.A.

---

[2] Our review of the transcript reveals two errors, namely that page 28 does not relate to this case and page 193 is not included in the record. However, neither error has any impact on our review of this case.

from March 30, 2022, the last time he was in her care; the photographs showed no visible bruising and also showed D.A. moving his arms and legs. Ms. Booker cared for D.A. overnight on March 30, 2022, until Ms. Brown picked D.A. up the next morning, March 31, to take him back to Defendant and Co-defendant Davis. Between March 31 and April 6, D.A. was primarily in the care of Defendant and Co-defendant Davis. Ms. Booker explained that if Ms. Brown cared for D.A. during that period of time, it would not have been for long because Ms. Brown did not keep D.A. overnight due to her work schedule.

Ms. Booker testified that on April 6, 2022, Defendant called her to care for D.A. while he went to work, but she was at an appointment, so Ms. Brown picked up D.A. Later that day, Ms. Brown called Ms. Booker because D.A. was crying. As instructed, Ms. Brown brought D.A. to Ms. Booker's home in Alamo and left shortly after. D.A. was in his car seat "wrapped up in a little swaddle blanket" and he was "crying a little bit." When Ms. Booker took D.A. out of the car seat, he was "kind of whiny [and] irritated," which she found unusual because D.A. was usually a "quiet baby." Ms. Booker laid D.A. down, and when she took his clothes off, she noticed that "something was wrong with his arm." There was a "knot" on D.A.'s upper left arm and when she would touch his arm, D.A. would "holler." D.A.'s left arm was not moving at all. D.A. would also "holler" when Ms. Booker touched his legs.

Ms. Booker called Defendant, but she hung up when she remembered he was at work and called Co-defendant Davis. She asked Co-defendant Davis if she had noticed "the spot over [D.A.'s] eye," and Co-defendant Davis said she had not. Ms. Booker told Co-defendant Davis that she was going to take D.A. to the hospital. Because Ms. Booker did not have D.A.'s identification or insurance information, she decided to take him to Dyersburg Hospital, where D.A. was born and where they had that information.

At some point, Ms. Booker was on a three-way phone call with Defendant and Co-defendant Davis. She asked Co-defendant Davis if she had noticed the injuries, and Co-defendant Davis responded that she had been at work and "didn't do this to him." Ms. Booker informed Defendant and Co-defendant Davis that there was a "spot over [D.A.'s] eye and his arm [was] dangling." She offered to "give them gas money" to get to Dyersburg. Ms. Booker advised Defendant to tell his boss that he needed to leave work for a family emergency, and told Co-defendant Davis to have a family member drive her to the hospital. Ms. Booker had "a lot" of phone calls with Defendant and Co-defendant Davis while she drove to the hospital. Neither Defendant nor Co-defendant Davis went to the hospital at that time.

The medical staff at Dyersburg Hospital determined that D.A. needed to be transferred to Le Bonheur Children's Hospital ("Le Bonheur") in Memphis for further treatment. Ms. Booker rode in the ambulance with D.A. Ms. Booker knew "it was

something serious" because there was "a team waiting" for D.A.'s arrival. She explained that medical staff "sedated" D.A. and ran tests on him. Testing revealed that he had "cracked" ribs on his left and right side and his "cranial was cracked." D.A.'s arm became more swollen and his "eye got blacker." Ms. Booker was unsure exactly how long D.A. stayed at Le Bonheur, but she knew that D.A. stayed "past" April 10, 2022. She recalled that D.A. "finally opened his eyes" on April 10. During his stay, D.A. was sedated to keep his legs in a certain position and he was swaddled tightly to keep him from moving his arm. Ms. Booker learned "[l]ater on" that D.A. had fractured legs. She recalled that Defendant and Co-defendant Davis went to Le Bonheur "like two days later" but were "stopped . . . at the door[.]" D.A. was released into Ms. Booker's custody and remained in her care since.

Ms. Booker testified that since D.A. incurred the injuries, he had more than eight seizures. D.A. went to physical therapy twice a week and occupational therapy three times a week and had recently started speech therapy because he "murmur[ed] his words."

On cross-examination by Defendant, Ms. Booker stated that she had not noticed any injuries on D.A. prior to April 6, 2022.

On redirect examination, when asked who took care of D.A. in the days prior to April 6, Ms. Booker responded that he had been with Defendant and Co-defendant Davis, but Defendant "was at work, and the baby was with" Co-defendant Davis.

Lauderdale County Sheriff's Office Investigator Richard DeSpain was dispatched to the Dyersburg Hospital emergency room to investigate injuries to a two-month-old baby. When he arrived, medical staff told him that D.A. showed signs of a broken humerus, the bone between his shoulder and elbow. Investigator DeSpain took a photograph of D.A.'s left arm, which showed the "shape of his arm, the way its drawed (sic) up[.]" He confirmed that D.A.'s arm was visibly swollen. Investigator DeSpain also took a photograph of a marking above D.A.'s left eye that was "alarming." D.A. "was very irritated [and] crying a lot." Ms. Booker was the only family member at the hospital with D.A.

Investigator DeSpain got phone numbers for Defendant and Co-defendant Davis. He called Defendant, who told him that he was not going to the hospital because he was at work. Defendant also told him that he and Co-defendant Davis did not have gas money to get to the hospital. A few days later, Investigator DeSpain contacted Defendant and Co-defendant Davis at their home and scheduled a time for them both to speak with him at the police station. At the scheduled meeting, Defendant and Co-defendant Davis declined to give a statement.

- 4 -

On cross-examination, Investigator DeSpain confirmed that D.A. had last been in Ms. Booker's care, before that Ms. Brown's care, and before that Defendant and Co-defendant Davis's care. He stated that he spoke informally with Ms. Brown for approximately twenty minutes on her front porch. Ms. Brown told him that she picked up D.A. from Defendant but he was fussy, so she called Ms. Booker for help.

Caitlin Hawkins, a physician's assistant at the emergency room in Dyersburg Hospital, treated D.A.; D.A.'s medical records, including markings made by Ms. Hawkins during her testimony were admitted into evidence. Ms. Hawkins confirmed that Ms. Booker was the only adult present with D.A. at the hospital. Ms. Booker told Ms. Hawkins that "supposedly there was an issue getting in and out of the car seat that could have caused . . . an accident." Ms. Hawkins observed "mild swelling and discoloration to the left upper eyelid" and an "obvious deformity to the mid upper arm."

An x-ray of D.A.'s "chest and abdomen" was taken with a "mobile [x]-ray machine." Two photographs from the x-ray images were admitted into evidence; one was zoomed in on D.A.'s left arm and showed that a portion of D.A.'s humerus was completely detached from, and not in line with, the rest of the bone. Ms. Hawkins described this as an "oblique fracture" to D.A.'s humerus, a "long bone." Ms. Hawkins explained that an "oblique fracture" is a fracture that is "at an angle" and that such an injury to a long bone "takes blunt force, and additionally to cause that angulation, a twisting or pulling sensation at the time of the force." She also explained that D.A.'s humerus was "displaced" meaning that the bone had "cracked and moved to a position that is not normal." The displacement is what caused the visible deformity to D.A.'s arm.

According to Ms. Hawkins, a two-month-old baby should not have this type of injury. She explained that D.A. was not mobile so the injury could not have been caused by an accidental fall; when children "do ambulate and fall, they have what's called supracondylar fractures, which are right above the elbow. They are not mid[-]shaft fractures." She further explained that pediatric bones were "very hard to break" because they are "more porous" and "pliable" so "more force is taken to break these bones, especially in the middle of a long bone."

No other injuries were noted on the images of D.A.'s chest and abdomen. When asked to explain why rib fractures were discovered at Le Bonheur, Ms. Hawkins explained that rib fractures can be difficult to detect and at times require x-ray images to be taken from multiple angles, which was not done at Dyersburg Hospital. She stated that the "goal was to identify the acute injury and get the patient to a higher level of care" than Dyersburg Hospital could provide.

Ms. Hawkins diagnosed D.A. with a "left humeral shaft fracture" and a "[c]ontusion of the left eyelid due to the bruising." She noted that "child physical abuse [was] suspected." Ms. Hawkins then arranged for D.A. to be transported to Le Bonheur via ambulance for more intensive medical care and DCS was notified.

On cross-examination, Ms. Hawkins stated that one would "have to struggle to get a kid in and out of a car seat to really pull their arm hard enough to break it in half." She explained that D.A.'s humerus fracture was an "acute" injury, meaning that it had happened within the seventy-two hours prior to the examination.

Dr. Lauren Burge, an expert in child abuse pediatrics, worked at Le Bonheur. D.A. was referred to Dr. Burge upon his arrival at Le Bonheur on April 6 because the emergency room doctors were concerned about child abuse. D.A.'s medical records from Le Bonheur, including markings made by Dr. Burge during her testimony, were admitted into evidence.

Dr. Burge ordered a "skeletal survey," which is a full body x-ray, and a head CT scan. Dr. Burge summarized D.A.'s injuries as a "[b]roken arm, broken leg, healing rib fractures on both sides, broken skull, bleeding over the brain, bruising on the eye, [and] bruising on the forehead." Dr. Burge marked each of D.A.'s injuries on a diagram, which was admitted into evidence.

Regarding D.A.'s head injuries, he had a "left parietal skull fracture" and a "subarachnoid hemorrhage underneath that fracture." Dr. Burge stated that it was "really rare that a kid will bleed in the brain" from accidental falls because it would take "significant force." She opined that a "competent caretaker" would have known about a fall significant enough to cause bleeding in the brain. D.A. also had a "linear bruise" on his forehead and bruising on his left eye.

D.A. had an oblique fracture to his left humerus, which Dr. Burge explained is typically caused "by twisting." Dr. Burge explained that because "baby bones . . . heal really well," D.A. did not need surgery. D.A. was "swathed" meaning that he was wrapped in a "nice, tight cloth to keep his bones still so that it will heal on its own." D.A. was still in the swath when Dr. Burge saw him for a follow-up visit "a month later" and opined that it would take "awhile" for the arm to heal.

D.A. also had a "corner fracture" on his right tibia, the shin bone, that "showed some healing[.]" A corner fracture is "caused through forcible traction and torsion also known as twisting and pulling." Dr. Burge stated that "only children get corner fractures" and that corner fractures "are highly specific for abuse."

D.A. also had "bilateral healing rib fractures." Dr. Burge explained that rib fractures are caused from blunt force trauma and "squeezing really hard . . . or hitting can break ribs." Dr. Burge explained that rib fractures were "[n]ot common" in children and were "highly specific for abuse in young infants." Dr. Burge explained that D.A.'s rib fractures were "in different stages of healing," which meant that "whatever caused [D.A.]'s rib fractures happened more than one time." She stated that it is possible that some of D.A.'s rib fractures were from his birth but "even if some of them were from birth, some of them were not[.]"

Dr. Burge was not "surprised" that Le Bonheur discovered rib fractures that were not diagnosed by Dyersburg Hospital. She explained that Le Bonheur "frequently" discovered rib fractures missed by another hospital because "rib fractures are notoriously difficult to identify, especially when you're not used to looking for them."

At D.A.'s follow-up appointment at the end of April 2022, Dr. Burge ordered another skeletal survey. She explained that it is typical to order another skeletal survey at a follow-up appointment because "it can be really hard to tell if someone has broken their bones when it's fresh." In D.A.'s case, Dr. Burge discovered "a healing left proximal tibia fracture" and more rib fractures.

Dr. Burge's official diagnosis was "child abuse[,]" and more specifically "abusive head trauma, inflicted cutaneous injury, and inflicted skeletal injury." Dr. Burge denied that D.A. had an underlying health condition that would contribute to these injuries.

When asked about possible explanations for D.A.'s injuries, Dr. Burge explained that "the amount of force to break a bone is just not going to be encountered in a two-month-old through the routine daily activities or developmental capabilities that a two-month[-]old would have." She specifically denied that D.A.'s arm could have been broken by a car seat or by being swaddled too tightly. Dr. Burge further opined that D.A's injuries were not caused by being dropped because when babies are dropped, "it's usually just a skull fracture and nothing else. These babies don't have bruising on multiple planes of their body. They don't have rib fractures. They don't have fractures in multiple stages of healing." She opined that D.A. "was feeling pain . . . that would be noticeable to a competent caretaker[.]"

On cross-examination, Dr. Burge clarified that D.A. had bleeding "over the brain [and] under the skull." She opined that D.A.'s skull fracture could have been the result of being dropped. She further opined that the rib fracture could have been caused by someone who was carrying D.A. tripping and falling onto D.A.

On redirect examination, Dr. Burge reiterated that while a fall could have caused the skull fracture, "bleeding over the brain is very, very rare and cause for concern especially in nonmobile infants." She opined that for a fall to have caused D.A.'s head injury, it would have to have "be[en] a serious complex fall involving multiple vectors of force." She noted that she was not told of such a fall.

On recross-examination, Dr. Burge agreed that a person falling while carrying D.A. would be a complex fall that could have caused the brain to bleed.

The State then rested its case and made the following election of offenses: abuse resulting in the broken arm, skull fracture, brain bleed, and the bruised left eye and forehead ("the acute injuries") in count one; exposure to child abuse resulting in serious bodily injury due to the acute injuries in count two; neglect resulting in the rib and leg fractures in count three; and failure to protect from the rib and leg fractures in count four.

Defendant testified D.A. was his only child. Defendant was excited to be a parent and stated that bringing D.A. home was "the best feeling ever." He averred that he was unsure how D.A. was injured but that "all the times he was with us, he was safe." In the two months between D.A.'s birth and April 6, 2022, Defendant worked at Komatsu. His regular hours were from 2:30 p.m. until 12:00 a.m., but he routinely worked overtime by going into work early.

Ms. Booker or Ms. Brown cared for D.A. when Defendant and Co-defendant Davis worked. Defendant denied noticing "anything off" with D.A. prior to April 6. He stated that he did not have any concerns about D.A.'s safety when D.A. was with Ms. Booker or Ms. Brown "at first." Defendant explained that when D.A. was in Ms. Booker's and Ms. Brown's care, he had a "feeling that [he] want[ed] to protect him" but he did not suspect that the women would hurt him. Defendant stated that Ms. Booker "physically struck" him when he was a teenager. He explained that Ms. Booker hit him with her bare hand, "a fist with a wedding ring in it to the head[,]" and that she had "choked [him] out." Defendant further recalled that Ms. Brown had hit him with "a bare hand, a switch, [a] flyswatter, and [an] extension cord."

On April 6, 2022, Defendant was called into work around 11:00 a.m. Because Ms. Booker was unavailable, he called Ms. Brown to care for D.A. Defendant said D.A. was wrapped up asleep in his car seat and "wasn't harmed or anything." "[A]round 8:08" p.m., Defendant received a text message and phone call from Ms. Booker. He did not answer while working but called her back when he took a break. Ms. Booker told him that she was going to take D.A. to the hospital. However, she did not tell Defendant that she was on the way until "around 10-something" and did not tell him which hospital. Defendant felt "nervous[,]" but his boss would not let him leave work because "[t]hey didn't have that

many workers that night." Defendant denied knowing the extent of D.A.'s injuries at the time. Ms. Booker told him "the next day before [he] went into work" that D.A. was being treated at Le Bonheur. Defendant and Co-defendant Davis attempted to go to Le Bonheur "after [they] got gas money" but DCS called and told them that "the case was already under investigation[,] and it was a no contact for [them] to go to the hospital." Defendant denied that Ms. Booker offered him gas money and asserted that he got the money from a co-worker. Defendant acknowledged that he had initially said that "it could have been the car seat that did that to [D.A.'s] arm," but that he did not know "for sure[.]" Defendant denied causing any of D.A.'s injuries and stated that D.A. "was the best thing" that had happened to him.

On cross-examination, Defendant stated that Ms. Booker started caring for D.A. when he was about three weeks old and started "keeping [D.A.] a lot" toward the end of March because Defendant was working more overtime. Defendant explained that when he was younger and in school, Ms. Booker and Ms. Brown would use corporal punishment when he got bad grades; he denied that he had disciplinary problems at school.

Defendant stated that D.A. was "exclusively" in his and Co-defendant Davis's care from April 3 until April 6. Defendant confirmed that he did not notice any injuries to D.A. when he changed and fed him on the morning of April 6. D.A. was asleep in his car seat when he dropped him off with Ms. Brown. Defendant asserted that he did not know what was wrong with D.A. until the next day when he was told that D.A. was at Le Bonheur. Defendant asserted that someone else caused all of D.A.'s injuries. He agreed that the car seat could be "eliminate[d]" as a cause of D.A.'s broken arm. Defendant acknowledged that he previously said D.A.'s arm was broken from being swaddled too tightly and explained that he had "made an assumption and just went with it." Defendant denied ever dropping D.A.

In rebuttal, the State recalled Ms. Brown and Ms. Booker. Both women admitted that they utilized corporal punishment when Defendant would misbehave at school but denied that they were abusive to Defendant. Both women also reaffirmed their prior testimony about the facts of the case.

Based on the above evidence, the jury convicted Defendant as charged. After a sentencing hearing, the trial court imposed concurrent fifteen-year sentences to be served at 100% for each conviction. Defendant filed a motion for new trial, which was denied on March 28, 2024. Defendant's timely appeal is now before this court.

## Analysis

On appeal, Defendant argues that the evidence was insufficient to support his convictions. Specifically, he asserts that there was "no direct evidence" that he caused D.A.'s injuries and the evidence did not prove that he had the requisite mental state for each offense. The State asserts that the evidence was sufficient. We agree with the State.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). Further, circumstantial evidence need not remove every reasonable hypothesis except that of guilt. *Id.* at 381 (quoting *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

A person commits aggravated child abuse, aggravated child neglect, or aggravated child endangerment when that person commits child abuse, neglect, or endangerment and such act results in serious bodily injury. T.C.A § 39-15-402(a). Serious bodily injury includes "a fracture of any bone" and "subarachnoid bleeding[.]" *Id.* § 39-15-402(c).

- 10 -

Child abuse occurs when a person knowingly treats a child under eight years of age in a "manner as to inflict injury." *Id.* § 39-15-401(a). A person commits child neglect when the person knowingly abuses or neglects a child less than eight years of age "so as to adversely affect the child's health and welfare[.]" *Id.* § 39-14-501(b); *see State v. Dewitt*, No. M2015-00816-CCA-R3-CD, 2016 WL 6638857, at *7 (Tenn. Crim. App. Nov. 10, 2016) (stating that the statute "defines child neglect as including abuse"). "[A] child is neglected whenever the breach of a legal duty endangers the health and welfare of that child or otherwise placed the child's health or welfare at some risk of harm." *State v. Gardner*, No. M2022-01131-CCA-R3-CD, 2024 WL 4624804, at *7 (Tenn. Crim. App. Oct. 30, 2024), *perm. app. pending*. Child abuse and neglect are nature-of-conduct offenses, meaning that "the mens rea of 'knowingly' is established when the proof shows that 'the person is *aware* of the nature of the conduct[.]'" *Id.* at *26 (first citing *State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000); and then citing T.C.A. § 39-11-106(23)); *State v. Mateyko*, 53 S.W.3d 666, 673 (Tenn. 2001).

A parent or custodian commits child endangerment who "knowingly exposes such child to or knowingly fails to protect such child from abuse or neglect resulting in physical injury or imminent danger to the child." T.C.A. § 39-15-401(c)(1)(A). For child endangerment, knowingly means that the parent:

> knew, or should have known upon a reasonable inquiry, that abuse to or neglect of the child would occur which would result in physical injury to the child. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary parent . . . would exercise under all the circumstances as viewed from the defendant's standpoint[.]

*Id.* § -401(c)(B)(ii). A defendant's mental state is a question of fact for the jury to determine. *State v. Davis*, 466 S.W.3d 49, 69-70 (Tenn. 2015).

Defendant argues that the evidence was insufficient to sustain each of his convictions because the evidence did not establish that he had the requisite mental state and there was no direct evidence that he caused D.A.'s injuries. Defendant does not challenge that he is D.A.'s father or that D.A. suffered serious bodily injury.

Initially, we note that "a criminal offense may be established solely by circumstantial evidence." *State v. Pegues*, No. W2014-00854-CCA-R3-CD, 2015 WL 3404736, at *11 (Tenn. Crim. App. May 27, 2015); *Dorantes*, 331 S.W.3d at 379. Thus, while Defendant argues that none of the witnesses testified that they saw him injure D.A., such testimony was not required.

When viewed in the light most favorable to the State, the evidence showed that D.A. was born in February 2022 to Defendant and Co-defendant Davis. When D.A. was approximately three weeks old, Ms. Booker and Ms. Brown began caring for him while his parents were at work. Dr. Abdelmisseh testified that he did not see any injuries on D.A. at his last appointment on March 24 and Ms. Booker testified that D.A. did not have injuries on March 30. Photographs from March 30 showed D.A. moving his limbs and there was no visible bruising on D.A.'s eye or forehead. From March 31 until April 6, when D.A.'s injuries were discovered, D.A. was exclusively in Defendant and Co-defendant Davis's care.

On April 6, when Ms. Brown picked up D.A. from Defendant, he was swaddled and asleep in his car seat; he remained asleep for approximately one and one-half hours. When Ms. Brown woke D.A., he was unusually fussy and unconsolable. Ms. Brown enlisted the help of Ms. Booker who noticed that D.A.'s left arm was swollen and that D.A. "hollered" when she touched it. D.A. also "hollered" when Ms. Booker touched his legs and she noticed a bruise on his left eye. Because of those injuries, Ms. Booker took D.A. to the hospital.

D.A. had an oblique fracture to his humerus, a fractured skull, a subarachnoid hemorrhage under the skull fracture, bruising to his left eye and forehead, broken ribs, and "corner fractures" to his left and right tibia. Ms. Hawkins described D.A.'s arm injury as acute, meaning that it occurred within seventy-two hours of her examination. She suspected that D.A. had been abused. Dr. Burge also opined that the oblique fracture was caused by "twisting," that corner fractures are caused by "twisting and pulling," and that rib fractures are caused by "blunt force trauma." Both corner fractures and rib fractures were "highly specific" for child abuse. Dr. Burge also opined that D.A.'s injuries were a result of child abuse, specifically "abusive head trauma, inflicted cutaneous injury, and inflicted skeletal injury."

Regarding the acute injuries to D.A. as charged in counts one and two, it is undisputed based on Defendant's testimony that D.A. was in the exclusive care and custody of Defendant and Co-defendant Davis from April 3 until April 6, 2022. *See State v. Nunn*, No. E2007-02333-CCA-R3-CD, 2009 WL 4790211, at \*25 (Tenn. Crim. App. Dec. 14, 2009) (finding the evidence sufficient to support child abuse convictions for both defendants when the evidence showed that the victim was in the exclusive care of the defendants at the estimate time that the injuries occurred). Ms. Hawkins testified that D.A.'s arm had been fractured within seventy-two hours of her examination and she suspected child abuse. According to Dr. Burge's testimony, the only injury that could have been accidental was D.A.'s skull fracture. However, she testified that accidental injury was inconsistent with the history she was provided and opined that D.A.'s injuries were nonaccidental inflicted trauma. As an expert in child abuse pediatrics, Dr. Burge diagnosed

- 12 -

D.A. with child abuse.  *See State v. Love*, No. M2015-00183-CCA-R3-CD, 2016 WL 4697583, at *11 (Tenn. Crim. App. Sept. 7, 2016) (stating that doctor testimony that the injury could have been non-accidental or accidental "provided sufficient evidence for a jury to have concluded that injury was the result of non-accidental conduct, and therefore, was knowing relative to the conduct involved").  Although Defendant repeatedly denied causing D.A.'s injuries, the jury was free to discredit his testimony in favor of evidence to the contrary.  *See Bland*, 958 S.W.2d at 651.  The circumstantial evidence was sufficient for the jury to find beyond a reasonable doubt that Defendant was aware that he treated D.A. in such a way to cause injury, and knew or should have known D.A. would be injured when Defendant exposed him to the abuse.

Regarding D.A.'s fractured ribs and legs as charged in counts three and four, Dr. Burge stated that both rib and corner fractures were "highly specific for abuse."  Corner fractures are caused by "twisting and pulling" and rib fractures are caused by "blunt force trauma."  Dr. Burge explained that because D.A.'s rib fractures were in different stages of healing, the fractures were inflicted at different times.  She stated that it would take a significant amount of force to cause these injuries and opined that D.A. would have been "feeling pain" that a "competent caretaker" would have noticed.  Based on this evidence, the jury could have found beyond a reasonable doubt that Defendant neglected D.A. and failed to protect D.A. from the abuse that caused these injuries which adversely affected D.A.'s health and welfare.

Because the evidence was sufficient to sustain each of his convictions, Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

s/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE

- 13 -